## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: COMCAST CORP. SET-TOP CABLE TELEVISION BOX ANTITRUST LITIGATION | ) ) ) ) | CIVIL ACTION NO. 2:09-md-02034-AB |

## MEMORANUDM OF LAW IN SUPPORT OF
## PLAINTIFFS' RENEWED MOTION FOR CERTIFICATION OF A SETTLEMENT
## CLASS AND PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 3

I.      COMCAST ANTITRUST LITIGATION .......................................................... 3

        A.      Brief Summary of Allegations and Plaintiff Groups .............................. 3

                1.      Federal antitrust Plaintiffs who did not opt-out of Comcast's arbitration clause and are not from California or Washington ...................................... 5

                2.      Arbitration opt-out Plaintiffs......................................................... 5

                3.      California Plaintiffs......................................................................... 5

                4.      Washington Plaintiffs..................................................................... 6

                5.      West Virginia *parens patriae* Action........................................... 6

II.     SUMMARY OF THE CLASS ACTION SETTLEMENT.................................. 6

        A.      The Risk of Individual Arbitration ........................................................ 7

        B.      The Risk of Dismissal............................................................................. 9

        C.      The Risk that the Court would Certify Only Regional Subclasses ....... 10

        D.      Benefits to the Class and Subclass ....................................................... 11

ARGUMENT .......................................................................................................... 13

I.      THIS CASE SATISFIES THE REQUIREMENTS FOR CERTIFICATION OF A SETTLEMENT CLASS ........................................................................... 13

        A.      The Elements of Rule 23(a) are Satisfied ............................................ 15

                1.      Numerosity is clearly present...................................................... 15

                2.      There are questions of law and fact common to all class members.......... 17

                3.      Plaintiffs' claims are typical of the claims of all class members .............. 18

4.      Plaintiffs and proposed Co-Lead Class Counsel have adequately represented the interests of the class ........................................................ 19

    a.      Counsel have ample experience in this kind of litigation and have, and will continue to, ably represent both Plaintiffs and the entire class ................................................................................................ 20

    b.      The proposed Class Representatives' interests are aligned with those of the class .......................................................................... 22

B.      The Requirements of Rule 23(b)(3) are likewise met in this settlement context ... 24

    1.      The questions of law and fact that are common to the class predominate over individual issues .................................................... 24

    2.      Class treatment of this matter is the best method to achieve judicial efficiency and ensure that all Plaintiffs have the opportunity to assert their claims ................................................................................ 27

C.      Proposed Co-Lead Class Counsel meet the requirements for appointment under Rule 23(g) ......................................................................... 29

II.      PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE ............... 29

A.      The Proposed Settlement and Plan of Distribution Satisfies a Preliminary Evaluation of Reasonableness ................................................................ 31

B.      The Settlement is the Result of Arm's-Length Negotiations ................................. 32

C.      The Settlement in this Case was Reached After the Provision of Sufficient Information, through Discovery or Discussion with Comcast .............................. 33

D.      The Parties are Experienced in Similar Litigation ................................................. 34

III.      THE PROPOSED FORM AND MANNER OF NOTICE AND SCHEDULE ARE REASONABLE ........................................................................... 34

A.      Plaintiffs Propose Providing Two Forms of Notice ............................................... 35

B.      The Proposed Notice Plan Assures that Class Members will Receive Adequate Notice of the Settlement .................................................................. 36

C.      It would be Appropriate to Approve the Claim Form and Plan of Distribution and Authorize the Class Administrator to Disseminate Notice of the Settlement and Receive and Process Class Member Claims ............................................ 37

D.      The Proposed Schedule is Reasonable .................................................................. 37

CONCLUSION ............................................................................................. 39

## <u>**TABLE OF AUTHORITIES**</u>

<u>CASES</u>

*AT&T Mobility LLC v. Concepcion*, 563 U.S. ___, 131 S. Ct. 1740 (2011) .............................6, 33

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997)...............................14, 24, 25, 27

*American Express Co. v. Italian Colors Restaurant,* 570 U.S. __, 133 S. Ct. 2304 (2013)..7, 8, 33

*Baby Neal for & by Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994)...................................17

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998)........................25

*Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201 (E.D. Pa. 2011).............................13, 16

*Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136 (E.D. Pa. 2000) ................................32

*Curiale v. Lenox Group, Inc.*, Civ. A. 07-1432, 2008 WL 4899474
(E.D. Pa. Nov. 14, 2008).........................................................................29, 30, 32

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) ...........................19, 22, 23

*Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3d Cir. 2010) ........................................29

*Fisher Bros. v. Phelps Dodge Indus., Inc.,* 604 F. Supp. 446 (E.D. Pa. 1985).............................34

*Gates v. Rohm & Haas Co.*, 248 F.R.D. 434 (E.D. Pa. 2008) ........................29, 30, 31, 32, 33, 35

*Gelder v. CoxCom, Inc.*, 696 F.3d 966 (10th Cir. 2012) ....................................... 10-11

*Girsh v. Jepson,* 521 F.2d 153 (3d Cir. 1975)...............................................................31

*Gray v. Marshall Cnty. Bd. Of Educ.*, 179 W.Va. 282, 367 S.E.2d 751 (1988)...........................26

*Hanrahan v. Britt*, 174 F.R.D. 356 (E.D. Pa. 1997) .......................................................34

*Hassine v. Jeffes*, 846 F.2d 169 (3d Cir. 1988)...........................................................19

*In re American Express Merchants' Litig.*, 634 F.3d 187 (2d Cir. 2011).......................................6

*In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 1068807 (E.D. Pa. May
11, 2004) ................................................................................................30

*In re Cmty. Bank of N. Va.*, 622 F.3d 275 (3d Cir. 2010).................................14, 15, 20

*In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484 (E.D. Pa. 2003).......................................35

*In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litig.*, 09-ML-2048-C, 2011
WL 6826813 (W.D. Okla. Dec. 28, 2011).............................................................................10, 33

*In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litig.*, 09-ML-2048-C, Slip.
Op. (W.D. Okla. Mar. 28, 2012)........................................................................................10, 33

*In re Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litig.*, 12-ML-2048-C, 2014
WL 104964 (W.D. Okla. Jan. 9, 2014)........................................................................................11

*In re Flonase Antitrust Litig.*, 284 F.R.D. 207 (E.D. Pa. 2012).................................................16

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008).....................14, 15, 24, 25

*In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) ..............................35

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009)............................................31

*In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631 (E.D. Pa. 2003)......................................30

*In re Nat'l Football League Players' Concussion Injury Litig.,* MDL 2323, 2014 WL 114351
(E.D. Pa. Jan. 14, 2014) ...............................................................................................................31

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010)..................................................14

*In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249
(E.D. Pa. 2012)................................................................................16, 19, 21, 25, 27, 28

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450 (D.N.J. 1997) ............36

*In re Prudential Ins. Co.,* 148 F.3d 283 (3d Cir.1998) ..........................................................14, 28

*In re Warfarin Antitrust Litig.,* 391 F.3d 516 (3d Cir. 2004)......................................................28

*In re Wellbutrin XL Antitrust Litig.*, Civ. A. 08-2431, 2011 WL 3563385 (E.D. Pa. Aug. 11,
2011) ..........................................................................................................................................16, 18

*Jerry Enters. of Gloucester County, Inc. v. Allied Beverage Group, L.L.C.*, 178 F.R.D. 437
(D.N.J. 1998)..................................................................................................................................18

*Kessel v. Monongalia Cnty. Gen. Hosp. Co.*, 220 W.Va. 602, 610, 648 S.E.2d 366 (2007).........26

*Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342 (Cal. App. 2d Dist. 2012).................25, 26

*Lake v. First Nationwide Bank*, 156 F.R.D. 615 (E.D. Pa. 1994)................................................34

*Marsden v. Select Med. Corp.*, 246 F.R.D. 480 (E.D. Pa. 2007)................................................16

*Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467 (E.D. Pa. 2007) ...............................30, 32, 35

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154 (3d Cir. 2001)...........18, 27

*Nichols v. SmithKline Beecham Corp.*, Civ. A. 00-6222, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ................................................................................................................................36

*N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1 (1958) ................................................................25

*Ridgeview Properties v. Starbuck*, 96 Wash.2d 716, 638 P.2d 1231 (Wash. 1982)....................26

*Samuel v. Equicredit Corp.*, No. Civ. A. 00-6196, 2002 WL 970396 (E.D. Pa. May 6, 2002) ....30

*State v. Black,* 100 Wash.2d 793, 676 P.2d 963 (Wash. 1984).....................................................26

*Stewart v. Abraham*, 275 F.3d 220, (3d. Cir. 2001).....................................................16

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) .........................................13, 14, 24

*Thomas v. NCO Fin. Sys., Inc.*, Civ. A. 00-5118, 2002 WL 1773035 (E.D. Pa. July 31, 2002)........................................................................................30, 33, 35

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) .........................................................14, 17

## STATUTES AND RULES

15 U.S.C. § 1................................................................................................................1, 5

15 U.S.C. § 15................................................................................................................8

28 U.S.C. § 1407................................................................................................................2

Fed. R. Civ. P. 23 ....................................................................................... *passim*

California's Business & Professions Code § 17200, *et seq.*........................................................5

Wash. Rev. Code § 19.86.010................................................................................................6

Wash. Rev. Code Ann. § 19.86................................................................................................6

W.Va. Code 47-18-16 (1978) ................................................................................................6, 26

## OTHER AUTHORITY

Herbert Hovenkamp, *Tying Arrangements and Class Actions*, 36 Vand. L. Rev. 213 (1983)........9

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97 (2009)................................................................................................................................17

4 *Newberg on Class Actions* (3d ed. 1992)................................................................................18

*Manual for Complex Litigation, Fourth* (2004)................................................................29, 34, 35

## INTRODUCTION

James E. Deanne,  Debra Koller, Leopoldo Herrera, and Daniel Steele (collectively, "Plaintiffs") submit this memorandum, on behalf of themselves and the putative Class members they seek to represent, in support of class certification and preliminary approval of the settlement reached with Defendants Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications, Inc., Comcast Cable Communications, LLC, and Comcast Cable Communications Holdings, Inc. (collectively, "Comcast").

This antitrust class action lawsuit alleges that Comcast, at all relevant times, unlawfully tied the sale of Premium Cable (as defined below) to the rental of a cable television set-top box from Comcast in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and certain state laws. A set-top box is a device that connects to, and is effectively an extension of, a television set. Plaintiffs allege that Comcast required them and members of the putative Class to rent Comcast's set-top box to receive all of the benefits of the Premium Cable services to which they subscribed. This case further alleges that, through this tying arrangement, Comcast substantially restricted competition in the market for the sale or rental of set-top boxes, enabling Comcast to reap supra-competitive profits from Plaintiffs and members of the putative Class and producing significant adverse effects on interstate commerce.

In addition to the federal antitrust claim, certain Plaintiffs assert that Comcast has engaged in unfair competition under the laws of California, and violated the antitrust and consumer protection laws of Washington.[1]  The West Virginia Attorney General has also asserted claims against Comcast, in a separate complaint, under West Virginia state law.

---

[1]  Unless otherwise noted, all references to "Washington" herein are intended to refer to the State of Washington, not Washington, District of Columbia.

This multidistrict litigation ("MDL") was transferred to this Court under 28 U.S.C. § 1407 by the Judicial Panel on Multi-District Litigation ("JPML") in June 2009.  Now, nearly five years later, and after more than two years of intensive settlement negotiations, Plaintiffs have reached a proposed settlement with Comcast.

The Second Amended Class Action Settlement Agreement ("Settlement Agreement") (Exhibit 1 hereto) is intended to resolve all claims of current subscribers (as defined below) concerning the tying of the sale of Comcast Premium Cable services to the rental of a Comcast set-top box during the period 2005 through the Effective Date (the "Class Period").

The settlement provides a recovery for Plaintiffs and the putative Class of current subscribers consisting of:

- enhanced disclosure by Comcast of Premium Cable subscribers' alternatives to renting a set-top box from Comcast (Exhibit F to the Settlement Agreement); and

- payments to eligible claimants, up to a collective value of $43 million, in the form of a credit, which shall be redeemable for Comcast premium services such as Showtime or Pay-per-view movies, and to customers also subscribing to Comcast internet service, upgraded internet performance, up to a maximum of:

  - $75.00 each for subscribers in California, West Virginia or Washington or who are from other jurisdictions and have opted out of the Arbitration Clause in Comcast's Subscriber Agreement; and

  - $21.98 each for current customers who subscribe to Comcast's services in jurisdictions other than California, West Virginia and Washington and who have not opted out of the Arbitration Clause.

As discussed more fully below, in light of the considerable challenges and substantial expense of continued litigation, the settlement posed herein is an excellent result for the Class. Accordingly, Plaintiffs respectfully request that the Court certify a settlement class, grant preliminary approval of the proposed Settlement and Plan of Distribution, approve the Forms of and Plan for Dissemination of Notice to the Class, approve the Claim Form, set a schedule for

objections and a Final Fairness Hearing, and appoint Class Representative Plaintiffs and Co-Lead Class Counsel.  A proposed order is submitted herewith.

## BACKGROUND

I.    **COMCAST ANTITRUST LITIGATION**

    A.    **Brief Summary of Allegations and Plaintiff Groups**

Comcast, which has more than 20 million customers in 39 states and the District of Columbia,[2] is the largest provider of cable multi-channel video programming distribution ("MVPD") in the United States.  Comcast faces minimal competition, if any, where it provides cable services and thus has substantial economic power where it operates.

This case is brought on behalf of a substantial subset of Comcast's customers, specifically, current subscribers[3] to Comcast's Premium Cable services within all of the jurisdictions in which Comcast operates.  Comcast's Premium Cable services include, *inter alia*:

- "On Demand" services that allow subscribers to watch certain programs at the time of their choosing and to pause, fast-forward, and rewind those programs;

- pay-per-view programming, which allows subscribers to purchase unique programs not otherwise available, including a variety of live entertainment;

- numerous specialty channels, such as news and sports channels;

- various channels that subscribers can pay to receive, like Showtime and Starz;

- high-definition channels, which enhance the image quality beyond that offered on

---

[2] Specifically, Comcast operates in certain areas of:  Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and the District of Columbia.

[3] To qualify for benefits under the Settlement Agreement, the Comcast customer must be a current subscriber as of the date Notice is provided under the Settlement Agreement and still subscribe to Comcast's Premium Cable services as of the Effective Date of the Settlement Agreement.

standard channels; and

- an interactive programming guide, which provides a simple means of navigating through the many options of cable programming available to customers, allowing them to select a desired program.

Plaintiffs allege that Comcast abuses its economic power by tying the purchase of Premium Cable to the rental, for a monthly fee, of a separate product from Comcast, the set-top box, which is sometimes called a digital receiver or digital converter.  The set-top box attaches to a television and is the only device that enables consumers to access all Premium Cable services. Each television that a customer has requires a separate set-top box, for which Comcast charges a monthly rental fee that in the aggregate potentially exceeds the value of the box.

Plaintiffs allege that Comcast tells customers that they must rent a Comcast set-top box to enjoy all of the benefits of Premium Cable.  It is undisputed that Comcast does not permit customers to buy Comcast's set-top boxes and makes it difficult for customers to determine how to obtain a third-party set top box that would be compatible with Comcast's system.

Comcast's Premium Cable customers cannot use set-top boxes obtained from sources other than Comcast to access the full panoply of Comcast's Premium Cable.  Boxes legally obtained from sources other than Comcast could be made to work on Comcast's cable network, with Comcast's cooperation, but that has not occurred.  At a minimum, set-top boxes other than those provided by Comcast cannot access Comcast's interactive services.

While all of the named Plaintiffs and the West Virginia Attorney General challenge the same conduct of Comcast, there are variations among certain Plaintiffs, largely revolving around (1) whether they are (or may be) subject to the Arbitration Clause contained in Comcast's Subscriber Agreement, which Comcast asserts — in a pending motion — would require that their claims go to individual, non-class arbitration, and (2) whether they assert state law claims in addition to or in lieu of the federal antitrust claim.  Specifically, the Plaintiff groups include:

4

### 1.    Federal antitrust Plaintiffs who did not opt-out of Comcast's arbitration clause and are not from California or Washington

The Fourth Amended Consolidated Class Action Complaint[4] asserts a federal antitrust tying claim, under Section 1 of the Sherman Act, 15 U.S.C. § 1, on behalf of a national class of purchasers of Comcast's Premium Cable packages.  Some members of that national class, however, who number in the thousands, opted out of the arbitration agreement and are thus not subject to Comcast's pending Motion to Compel Arbitration.  Additionally, Comcast did not enforce its arbitration clause for customers in California and Washington, and thus did not move to compel those customers' claims.  The first (and largest) group of Plaintiffs includes current subscribers who did not opt-out of the Arbitration Clause and who are not subscribers in California or Washington.

### 2.    Arbitration opt-out Plaintiffs

Although Comcast's customer agreements contain a mandatory, binding arbitration clause with a class action waiver, Comcast allowed its Premium Cable subscribers to "opt-out" of arbitration by either notifying Comcast via U.S. Mail of their intention to opt-out, or by completing a form online.  The Arbitration opt-out Plaintiffs consist of Sherman Act Plaintiffs who are from states other than California and Washington and opted-out of the arbitration clause.

### 3.    California Plaintiffs

As noted, because Comcast's arbitration clause does not apply to its California subscribers, they are not subject to Comcast's Motion to Compel Arbitration.  The California Plaintiffs assert, in addition to a Sherman Act tying claim, claims for unfair competition under California's Business & Professions Code § 17200, *et seq*.

---

[4] Plaintiffs have filed concurrently with this motion, a Motion for Leave to File a Fourth Amended Consolidated Class Action Complaint and Voluntarily Dismiss Claims of Former Comcast Subscribers to assert claims on behalf of a Class of current subscribers.

### 4. **Washington Plaintiffs**

Like Comcast's California subscribers, its Washington subscribers are not subject to Comcast's arbitration clause and Comcast, accordingly, has not moved to arbitrate their claims. In addition to a Sherman Act tying claim, the Washington Plaintiffs also assert claims under Washington's antitrust statute, Wash. Rev. Code § 19.86.030, and the Washington Consumer Protection Act, Wash. Rev. Code Ann. § 19.86.

### 5. **West Virginia *parens patriae* Action**

A separately captioned case, originally filed as *West Virginia ex. rel. McGraw v. Comcast Corp*., No. 09-cv-00091 (N.D. W.Va.) ("*McGraw*"), has been brought by counsel deputized as Special Assistants to the Attorney General of West Virginia.  The *McGraw* case does not assert any federal claims:  it asserts only West Virginia state law claims under West Virginia's Antitrust Act, Consumer Credit and Protection Act, and common law.  Comcast has not moved to compel arbitration of those claims.

## II. SUMMARY OF THE CLASS ACTION SETTLEMENT

Plaintiffs' counsel and counsel for Comcast have been engaged in extensive arms-length settlement negotiations for more than two years, beginning with discussions that preceded the December 21, 2011 settlement conference with the Court.  That Court conference followed oral argument on Comcast's Motion to Compel Arbitration, during which the Court made clear that serious consideration would need to be given to the arbitration issue, particularly in light of Supreme Court and other federal appellate court jurisprudence — *i.e., AT&T Mobility LLC v. Concepcion*, 563, U.S. ___, 131 S. Ct. 1740 (2011) and *In re American Express Merchants' Litig*., 634 F.3d 187 (2d Cir. 2011) ("*AmEx II*").  The Court made clear that neither side could count on victory as a foregone conclusion and encouraged the parties to further explore the

possibility of settlement.  The appropriateness of settlement has now been further demonstrated by the Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant,* 570 U.S. __, 133 S. Ct. 2304 (2013) (*"AmEx III"*), which was issued on June 20, 2013.

On January 23, 2012, the parties participated in the first of what would be five formal mediation sessions before Thomas Rutter, Esquire, of ADR Options in Philadelphia.[5]  Before, during, and since those formal mediation sessions, counsel for the parties also exchanged many communications concerning settlement — by telephone, letter, in-person discussions, and e-mail. Throughout these negotiations, the parties had regular contact with the Court about their progress, both by teleconference and during in-chambers meetings and sought to address the Court's concerns with the potential settlement.

Throughout the course of these settlement negotiations, Plaintiffs have had the opportunity to explore many of the issues that they otherwise would have pursued in formal discovery, allowing Plaintiffs to better assess the issues and the strengths of the allegations in the case, as well as the risks that continued litigation would present.  These risks, many of which could end this litigation for Plaintiffs altogether, resulting in no recovery, include, among others:

A.      The Risk of Individual Arbitration

Plaintiffs who are not subscribers in California or Washington and who did not opt out of the Arbitration Clause (*i.e.*, the vast majority of Plaintiffs) face a substantial risk that Comcast's Arbitration Clause will be enforced.  While Plaintiffs believe their position on this issue is the correct one, Comcast originally based its argument on the United States Supreme Court's decision in *Concepcion*, which Comcast likely would seek to supplement based on the *AmEx III* decision.

---

[5] The other formal negotiation sessions occurred on May 4, June 25, July 9, and September 20, 2012.

Moreover, on June 20, 2013, the Supreme Court rendered its decision in *AmEx III*, which, unlike *Concepcion*, deals squarely with the same arbitration issue in this case. The Supreme Court has now reversed the Second Circuit Court of Appeals and forced the Sherman Act plaintiffs in *AmEx III* to individually arbitrate their claims. Absent some anomaly, Plaintiffs in this case likely would suffer the same fate if the parties had not already agreed to settle.

As discussed at length in Plaintiffs' earlier briefing on this issue (*see* Doc. Nos. 128, 133), which Plaintiffs incorporate by reference, individual arbitration is not a viable option for redressing these low-dollar-value Sherman Act claims. A Section 1 tying claim is a complex claim, which realistically requires economic expert analysis and representation by counsel. In this regard, Plaintiffs incorporate by reference the affidavit of economist Hal J. Singer, Ph.D., which was submitted in response to Comcast's Motion to Compel Arbitration (Doc. No. 128). The costs of the necessary economic expert alone would dwarf the individual recovery, and those expert costs would not be recoverable even if the plaintiff prevailed. For just this reason, no rational consumer or attorney would bring such an individual case.

In addition, because the potential recovery would be so small, no sensible attorney could take the case on a contingency basis, and because the attorney time required would be so substantial, no realistic client would — or, with few exceptions, *could* — pay an attorney on an hourly basis. While the Clayton Act provides for the recovery of a "reasonable attorney's fee" if the plaintiff prevails, 15 U.S.C. § 15, the amount of such a fee request would be so disproportionate to the client's recovery, even if the latter were trebled, as to give any attorney doubt about such a request being granted. Absent representation by counsel, it is simply unrealistic to suggest that a layperson could be expected to pursue an antitrust tying claim *pro se* against Comcast and its attorneys.

Ordering the Sherman Act claims in this case to individual arbitration will thus, as a real, practical matter, be the death knell for the claims. They will never be heard. Regardless of their merit, the cases will simply and effectively be silenced. The protection and rights conferred under Section 1 will, for Plaintiffs and the proposed Class, be meaningless. This significant risk has not been lost on Plaintiffs.

**B.      The Risk of Dismissal**

Plaintiffs also face the risk of dismissal, whether on a motion to dismiss or a motion for summary judgment. Tying cases have been recognized to be among the most challenging of all antitrust cases. *See* Herbert Hovenkamp, *Tying Arrangements and Class Actions*, 36 Vand. L. Rev. 213 (1983) ("Few areas of federal antitrust law are more confusing than the law that governs tying arrangements."). The legal hurdles that Plaintiffs would have to surmount to avoid dismissal are thus higher in this kind of case than in other antitrust cases — themselves typically complex — and certainly higher than in cases involving simpler legal theories. Moreover, while Plaintiffs would need to overcome each such hurdle, Comcast, by contrast, would need only to succeed in challenging one of them to bring down Plaintiffs' case. The risks are therefore substantial that even if Plaintiffs' claims were to survive Comcast's Motion to Compel Arbitration, they might nonetheless subsequently be dismissed.

Comcast has suggested, for example, that Plaintiffs face the risk of being unable to establish that a retail market would ever exist for set-top boxes to be purchased by consumers and then used on Comcast's system. Set-top boxes are not currently available for purchase at retail stores. This could, of course, be due to the conduct about which Plaintiffs complain in this case (*i.e.*, that Comcast will not allow such boxes to be used on its system, resulting in a lack of incentive for anyone to manufacture and market them for private sale). Comcast has asserted,

however, that the absence of a set-top box retail market is simply as a result of little to no

consumer interest, directing Plaintiffs to trial efforts by Panasonic to sell set-top boxes in four

select markets and Panasonic's decision not to proceed with such retail sales after finding a lack

of consumer demand.

###### C.     The Risk that the Court would Certify Only Regional Subclasses

Plaintiffs who are not California or Washington subscribers and who did not opt-out of

the Arbitration Clause face the risk that the Court would decline to certify them in a single class,

and would instead divide them into numerous regional subclasses based on Comcast's different

markets throughout the country.  Any such division into subclasses would be detrimental to this

case, because it would multiply astronomically the costs of seeking class certification, given the

many markets and jurisdictions in which Comcast operates.

Plaintiffs need not speculate about this risk.  In a similar antitrust tying case against a

different cable television provider, *In re Cox Enterprises, Inc. Set-Top Cable Television Box

Antitrust Litig.*, 09-ML-2048-C, 2011 WL 6826813 (W.D. Okla. Dec. 28, 2011), the district

court declined to certify a national class, holding that market power and antitrust injury could not

be proven on a national level, and that multiple regional analyses would be required on these

issues.  *See id.* at **10-16.

The *Cox* plaintiffs moved for reconsideration of the district court's order, arguing that the

defendant had not provided the data necessary for the plaintiffs to brief and argue regional

markets in their class certification motion, but the court rejected the plaintiffs' argument.  *In re

Cox Enterprises, Inc. Set-Top Cable Television Box Antitrust Litig.*, 09-ML-2048-C, Slip. Op.

(W.D. Okla. Mar. 28, 2012) (attached as Exhibit 2).  The plaintiffs then appealed the issue to the

Tenth Circuit, but it held that the matter was not appropriate for immediate review.  *See Gelder*

*v. CoxCom, Inc.*, 696 F.3d 966, 969 (10th Cir. 2012).[6]  In January 2014, the *Cox* court certified a

small regional class consisting of the Oklahoma City market.  *In re Cox Enterprises, Inc. Set-Top*

*Cable Television Box Antitrust Litig.*, 12-ML-2048-C, 2014 WL 104964 (W.D. Okla. Jan. 9,

2014).  Cox, however filed a Rule 23(f) Petition before the Tenth Circuit Court of Appeals, so

there is no guarantee that even this smaller class will remain certified.

In light of these and other substantial risks, the proposed Settlement is an excellent one

for Plaintiffs.

### D.     Benefits to the Class and Subclass

In the resulting Settlement Agreement, Plaintiffs and Comcast agreed to a proposed

nationwide Settlement, which provides, for class members who file appropriate, timely Claim

Forms, Settlement Credits redeemable for Comcast services as follows:

Class members *who are not members of the Subclass* shall be entitled to select one of the

following options, depending on the length of time they rented a set-top box from Comcast:

If the Claimant rented at least one Set-Top Box for 60 or more months (more than 5
years), the Claimant is entitled to select one of the following options:

(a) three (3) free pay-per-view movies (an estimated $17.97 value); or

(b) for customers who also subscribe to Xfinity high speed internet service, two
(2) free pay-per-view movies plus one (1) month free upgrade in Internet
service from Performance Level to Blast!® (an estimated $21.98  value).

If the Claimant rented at least one Set-Top Box from 36 to 59 months (3 to 5 years), the
Claimant is entitled to select one of the following options:

(a) two (2) pay-per-view movies (an estimated $11.98 value); or

(b) for customers who also subscribe to Xfinity high speed internet service, one
(1) free pay-per-view movie plus one (1) month free upgrade in Internet
service from Performance Level to Blast!® (an estimated $15.99 value).

---

[6] Similarly, there is also the risk that even if this Court were to certify this group in a single class,
that decision would be overturned on appeal.

If the Claimant rented at least one Set-Top Box from 1 to 35 months (0 to 3 years), the Claimant is entitled to select one of the following options:

> (a) one (1) pay-per-view movie (an estimated $5.99 value); or
>
> (b) for customers who also subscribe to Xfinity high speed internet service, one (1) month free upgrade in Internet service from Performance Level to Blast!® (an estimated $10.00 value).

Class members *who are members of the Subclass* shall be entitled to select one of the following options, depending on the length of time they rented a set-top box from Comcast:

If the Subclass Claimant rented at least one Set-Top Box for 60 or more months (more than 5 years), the Subclass Claimant is entitled to select one of the following options:

> (a) three (3) free months of Showtime (an estimated $65.85 value);
>
> (b) two (2) free months of Showtime plus three (3) pay-per-view movies (an estimated $61.87 value); or
>
> (c) for customers who also subscribe to Xfinity high speed internet service, three (3) months free upgrade in Internet service from Blast!® to Extreme 50® Internet service (an estimated $75.00 value).

If the Subclass Claimant rented at least one Set-Top Box from 36 to 59 months (3 to 5 years), the Subclass Claimant is entitled to select one of the following options:

> (a) two (2) free months of Showtime (an estimated $43.90 value); or
>
> (b) one (1) month of Showtime plus three (3) pay-per-view movies (an estimated $39.92 value); or
>
> (c) for customers who also subscribe to Xfinity high speed internet service, two (2) months free upgrade in Internet service from Blast!® to Extreme 50® Internet service (an estimated $50.00 value).

If the Subclass Claimant rented at least one Set-Top Box from 1 to 35 months (0 to 3 years), the Subclass Claimant is entitled to select one of the following options:

> (a) one (1) month of Showtime (an estimated $21.95 value); or
>
> (b) four (4) pay per view movies (an estimated $23.96 value); or
>
> (c) for customers who also subscribe to Xfinity high speed internet service, one (1) month free upgrade in Internet service from Blast!® to Extreme 50® Internet service (an estimated $25.00 value).

12

Subclass Claimants who rented more than one (1) Set-Top Box during the Class Period will be entitled to additional relief.  Specifically, Subclass Claimants will be entitled to one (1) additional pay-per-view movie rental (an estimated $5.99 in value).[7]

Notice will be disseminated in a manner calculated to reach each member of the proposed Class.  Class members will each receive individual Notice via an insert in their monthly bill.  The parties will also establish an internet settlement website that will display the notice and the claim form at www.SetTopBoxSettlement.com.

In light of the challenges to recovery and the expense and uncertainty of continued litigation, this result is an exceptional benefit to the Class.

## ARGUMENT

### I.   THIS CASE SATISFIES THE REQUIREMENTS FOR CERTIFICATION OF A SETTLEMENT CLASS.

For a lawsuit to be maintained as a class action under Rule 23, the class must meet the four prerequisites of Rule 23(a)—numerosity of parties, commonality of factual and legal issues, typicality of claims and defenses of the class representative(s), and adequacy of representation — as well as the requirements of one of the subsections of Rule 23(b).  *See* Fed. R. Civ. P. 23(a); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 296 (3d Cir. 2011).  Here, Plaintiffs seek certification under Rule 23(b)(3), which requires that common issues predominate over individual ones and that a class action be superior to other available methods of adjudication.

---

[7] As this Court has noted, settlements involving non-monetary awards deserve careful consideration to ensure that the proposed relief has actual value to the class.  *Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201, 215 n.17 (E.D. Pa. 2011) (Brody, J.) (citing Fed. R. Civ. P. 23 advisory committee note; Class Action Fairness Act, 28 U.S.C. § 1712).  This is not a so-called "coupon" settlement.  Claimants will receive certificates that will allow them to choose from a variety of offerings, including ones that will not require them to make any extra payment to Comcast to enjoy the benefits of the settlement.  If a claimant does not want to spend anything more than the value of the certificate, the claimant does not have to.

*See* Fed. R. Civ. P. 23(b); *Sullivan,* 667 F.3d at 296.  Class certification is only appropriate if "the trial court is satisfied, after a rigorous analysis, that the prerequisites . . . have been satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

"The [United States] Supreme Court has made clear that '[s]ettlement is relevant to a class certification.'" *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619 (1997)).  Accordingly, a district court may consider a proposed settlement when evaluating whether class certification is appropriate, *Pet Food,* 529 F.3d at 341 (citing *In re Prudential Ins. Co.,* 148 F.3d 283, 308 (3d Cir. 1998)), and thus need not inquire, in the context of a request to certify a settlement class, "whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

While the Third Circuit Court of Appeals made clear in *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008) that a limited consideration of the merits *may* be relevant in considering a motion for class certification, it also made clear that the reason for this is not to predict which party will prevail on the merits. *Id.* at 317 n.17.  Rather, consideration of merits issues is permissible only as those issues pertain to the requirements of Rule 23; if there is no such Rule 23 connection, the inquiry is inappropriate. *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 294 (3d Cir. 2010), as amended (Oct. 20, 2010) (citations omitted).  The touchstone of the class certification inquiry thus remains whether the Rule 23 requirements have been satisfied, not whether the plaintiffs have stated a cause of action. *Id.* at 294-95 (citations omitted).

The overarching purpose of Rule 23 is to ensure that courts will identify the common interests of the class members and evaluate the ability of the named plaintiffs and their counsel to fairly and adequately protect the interests of the class.  *Id.* at 291 (citation omitted).

Plaintiffs request certification of the following Class for settlement:

All persons who, or entities which: (a) have subscribed to Premium Cable in the United States; (b) have paid Comcast a rental fee for a Set-Top Box; (c) have received the Notice provided for in paragraph 4 of this Agreement; and (d) are a Comcast subscriber as of the Effective Date.

There is one subclass within the Class Definition.  The "Subclass" is comprised of the persons or entities described above who reside within the states of California, West Virginia, and Washington and all Current Subscribers who opted-out of Comcast's arbitration clause as recorded within the arbitration clause opt-out lists kept at Comcast's offices.

Excluded from the Settlement Class are: (i) those persons who opt out of the Settlement; (ii) Comcast officers, directors, or employees, any entity in which Comcast has a controlling interest, and the affiliates, legal representatives, attorneys, heirs, or assigns of Comcast; (iii) Class Counsel and Class Counsel's employees; and (iv) Judge Anita B. Brody and members of her judicial staff of the United States District Court for the Eastern District of Pennsylvania, as well as and any federal, state, or local governmental agency, and any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staffs.

For the reasons set forth below, this proposed Class meets all of the Rule 23 requirements for certification.

## A.     The Elements of Rule 23(a) are Satisfied

### 1.     Numerosity is clearly present

The first element of Rule 23(a) requires that the class be of sufficient size that joinder of all members is "impracticable."  Fed. R. Civ. P. 23(a)(1).  A plaintiff need not show that joinder

is "impossible" to show that it is "impracticable." *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 260 (E.D. Pa. 2012) (Pratter, J.).

"No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d. Cir. 2001) (holding that a class of 67 people was sufficiently numerous). *See also In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 217 (E.D. Pa. 2012) (Brody, J.) (citing *Stewart,* 275 F.3d at 226-27 for the aforementioned point); *Chakejian*, 275 F.R.D. at 209 (similarly citing *Stewart*).

Courts have, however, found the numerosity requirement satisfied with fewer than forty class members. *See, e.g., In re Wellbutrin XL Antitrust Litig.*, Civ. A. 08-2431, 2011 WL 3563385, at *3 (E.D. Pa. Aug. 11, 2011) (McLaughlin, J.) (holding that numerosity was satisfied where there were 33 class members).

Some courts have said that the numerosity requirement also calls for consideration of whether geographic disbursement of the class members, in addition to their numbers, would make joinder impracticable. *See, e.g., Marsden v. Select Med. Corp.*, 246 F.R.D. 480, 484 (E.D. Pa. 2007) (Joyner, J.) (holding that where class members were not only sufficiently numerous, but also "likely very geographically dispersed, . . . [j]oinder . . . would [have] be[en] impracticable.").

There can be no legitimate dispute about numerosity here.  The members of the proposed Class number in the millions.  Comcast has represented to Plaintiffs, in the course of settlement negotiations, that total Premium Cable subscribers exceed 20 million, and are located throughout the country, in 39 states and the District of Columbia.  It has further represented that the number

of Premium Cable subscribers in California exceeds 750,000, and that the number in Washington exceeds 350,000.

### 2.  There are questions of law and fact common to all class members

Rule 23(a)'s second element requires a showing of the existence of "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  While the rule is stated in the plural (*i.e.*, questions, not question), as the Supreme Court recently observed, only a single common question of law or fact need be identified.  *Dukes*, 131 S. Ct. at 2556.  *See also Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

The relevant issue for class certification "'is not the raising of common 'questions' — even in droves — but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'"  *Dukes*, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Commonality may be shown by demonstrating that "the class members have suffered the same injury."  *Dukes*, 131 S. Ct. at 2551 (internal quotations, citation omitted).  "Their claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*

Plaintiffs here all allege the same harm:  the payment of supracompetitive prices as a result of Comcast's unlawful tying of its Premium Cable services to the rental of a Comcast set-top box.  If the answers to whether Comcast engaged in such conduct and Plaintiffs suffered harm as a result are in the affirmative, those answers are common to all Class members.  There

are no dissimilarities; Plaintiffs allege that Comcast's conduct was the same vis-à-vis each of them.

Courts in other recent (*i.e.*, post-*Dukes*) antitrust cases have found that commonality was met under similar circumstances. *See, e.g., Wellbutrin XL*, 282 F.R.D. at 137 (holding that commonality was satisfied where each class member's claim depended on whether "the defendants unlawfully engaged in anticompetitive behavior to limit the entry of generic competitors in violation of each state's respective antitrust and/or consumer protection laws"). As noted in that same case, it did not matter that the case was brought under varying state consumer protection laws, since such laws do not vary in material respects. *Id.* The same is true of the Sherman Act and the state laws—of California, Washington, and West Virginia—that are asserted here. The essential elements of Plaintiffs claims would require common proof under each of these laws.

Indeed, the very nature of antitrust cases brought under Section 1 of the Sherman Act has routinely led courts to find that commonality exists. *See Jerry Enters. of Gloucester County, Inc. v. Allied Beverage Group, L.L.C.*, 178 F.R.D. 437, 442 (D.N.J. 1998) (citing 4 *Newberg on Class Actions* § 18.25 at 18-81 (3d ed. 1992) (noting that "common issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues.")).

### 3.   Plaintiffs' claims are typical of the claims of all class members

To satisfy the typicality requirement, the "claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fedf. R. Civ. P. 23(a)(3). Typicality is established by showing that the claims of the plaintiffs and the putative class "involve the same conduct by the defendant." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 183-84 (3d Cir. 2001).

Thus, typicality is established where the named plaintiffs allege that they and all putative class members have suffered economic damages arising from artificially inflated purchase prices as a result of the defendants' purported anticompetitive conduct.  *Processed Egg Prods.,* 284 F.R.D. at 261.  Those are precisely the kinds of allegations that Plaintiffs assert here, on behalf of themselves and the proposed Class.  Specifically, Plaintiffs allege that Comcast unlawfully tied the sale of its Premium Cable services to the rental of a Comcast set-top box; that this activity substantially restricted competition in the market for the sale or rental of set-top boxes, while allowing Comcast to reap supracompetitive profits from Plaintiffs and all Class members; and that Plaintiffs and all Class members were injured in the same manner, by being forced to pay Comcast's supracompetitive rental fees to enjoy the full panoply of benefits of the Premium Cable services to which they subscribed.

### 4.   Plaintiffs and proposed Co-Lead Class Counsel have adequately represented the interests of the Class

The final prong of Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This prerequisite has two components, the first concerning the experience and performance of class counsel, and the second concerning the interests and incentives of the representative plaintiffs.  *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012) (citation omitted). "Essentially, the inquiry into the adequacy of the representative parties examines whether 'the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class.'"  *Processed Egg Prods.*, 284 F.R.D. at 261 (quoting *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988)).

19

> **a.** **Counsel have ample experience in this kind of litigation and have, and will continue to, ably represent both Plaintiffs and the entire Class**

Since the 2003 addition of subsection (g) to Rule 23, questions concerning the adequacy of class counsel are best discussed under that subsection's framework. *Cmty. Bank*, 622 F.3d at 292. Under Rule 23(g), a court that certifies a class must appoint class counsel, who is charged with fairly and adequately representing the interests of the class. Fed. R. Civ. P. 23(g)(1)(A). Rule 23(g) lists the following factors that courts must consider in appointing class counsel:

- the work counsel has done in identifying or investigating the potential claims in the action;

- counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action;

- counsel's knowledge of the applicable law, and

- the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). In addition, courts may consider any other matters pertinent to whether proposed class counsel is able to adequately represent the interests of the class. Fed. R. Civ. P. 23(g)(1)(B).

Here, Plaintiffs seek appointment of Dianne M. Nast, Kenneth A. Wexler and Stephen A. Corr as Co-Lead Class Counsel. Ms. Nast, Mr. Wexler and Mr. Corr have been involved in this case from its inception, conducting an initial investigation into the potential claims and being among the first counsel to file individual complaints, before the creation of this MDL. Since then, they have played an integral role in organizing and pursuing the MDL litigation on behalf of Plaintiffs and the putative class.

Ms. Nast was previously appointed by this Court as Lead Counsel on October 23, 2009, via CMO No. 2 (Doc. No. 23), as part of her prior firm, RodaNast, P.C., and the Lead Counsel designation was transferred, by Order of November 28, 2012 (Doc. No. 170), to her current firm,

NastLaw LLC.

Ms. Nast, Mr. Wexler and Mr. Corr have extensive knowledge of antitrust law and class action practice, as well as substantial experience handling class actions and complex litigation, including antitrust litigation.  Their abilities, along with those of their equally qualified co-counsel, have been repeatedly recognized by courts.  *See* Biographies and/or Resumes of proposed Class Counsel, attached as Exhibits 3, 4 and 5.

They have demonstrated a commitment to prosecuting the case through the work they have done to identify and investigate this case, their involvement in this case to date, and their participation in settlement negotiations, which were conducted from a position of knowledge and strength and on behalf of the entire Class.

Together with their many similarly qualified and experienced co-counsel, they have committed and will continue to commit the necessary resources to making sure that Plaintiffs and absent Class members are well represented in this litigation and proposed settlement.

For these reasons, Plaintiffs respectfully submit that the proposed Co-Lead Class Counsel meets the requirements for appointment under Rule 23(g) and thus likewise the first component of Rule 23(a)(4)'s adequacy requirement.  *See Processed Egg Prods.*, 284 F.R.D. at 291 (E.D. Pa. 2012) (finding that adequacy was supported where the attorneys representing the plaintiffs and the class were highly qualified and experienced in complex class action litigation, including antitrust law; had previously been appointed and served as interim co-lead counsel in the case; and had demonstrated their dedication and ability, through their handling of the subject litigation).

> **b.    The proposed Class Representatives' interests are aligned with those of the Class**

The Third Circuit has observed that the "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey*, 681 F.3d at 183 (citations omitted).  The adequacy requirement is designed to "ferret out" intra-class conflicts that may cause the interests of the representative plaintiffs to depart from those of the absent class members.  *Id.* at 183-84 (citations omitted).

Here, the interests of the named Plaintiffs and the putative Class members are aligned; there are no conflicts that would render the named Plaintiffs inadequate representatives of the Class at large.  The representative Plaintiffs and all members of the proposed Class have similar interests in establishing liability against Comcast for the same kind of anticompetitive conduct and recovering, on behalf of each eligible claimant, relief resulting from that conduct.  By pursuing this litigation, each representative Plaintiff necessarily advances the common interests of all other Class members.

Moreover, to the extent that any perceived conflicts might be suggested to exist between different members of the class (*i.e.*, the California subscribers, the Washington subscribers, the subscribers who opted out of the Arbitration clause, the interests in the *McGraw* case, and the balance of the class), Plaintiffs' counsel prophylactically ensured that each group had a voice in settlement negotiations, by assigning specific attorneys to represent these groups.  Specifically:

- Plaintiffs' Executive Committee member and proposed Co-Lead Class Counsel, Kenneth A. Wexler, has represented the group of federal antitrust Plaintiffs who did not opt-out of arbitration, and are not from either California or Washington, and thus are subject to Comcast's Motion to Compel Arbitration.

- Plaintiffs' Executive Committee member Joe R. Whatley, Jr. has represented the group of Sherman Act Plaintiffs who are from states other than California and Washington (where the arbitration clause does not apply) and opted out of the arbitration clause.

22

- Plaintiffs' Executive Committee member William M. Sweetnam, who represents named California Plaintiff Leopoldo Herrera, has represented the California subscribers, who are not subject to the arbitration clause and who, in addition to the federal antitrust claim, also assert California state law claims.

- Plaintiffs' Executive Committee member Michael L. Murphy, who represents named Washington Plaintiff James Deanne, has represented the Washington subscribers, who are not subject to the arbitration clause and who, in addition to the federal antitrust claim, also assert Washington state law claims.

- Attorney Carl N. Frankovitch is counsel for the plaintiff in the separately filed West Virginia action, which does not assert any federal claims, but only West Virginia state law claims.

For a conflict to preclude class certification, the disagreement between plaintiffs and other class members must be of a "fundamental" nature, such as where some class members claim to have been harmed by conduct that benefitted other class member, or where a conflict exists among the allocation of remedies among class members with competing interests. *Dewey,* 681 F.3d at 184 (citations omitted). Thus, a purported conflict that is merely speculative or hypothetical is not a valid basis to deny class certification. *Id.* (citations omitted).

There is nothing to suggest that the representative Plaintiffs have significant interests antagonistic to those of the absent Class members in the vigorous pursuit of the Class claims against Comcast. Here, Plaintiffs seek to represent current subscribers to Comcast's Premium Cable services, each of whom was impacted by Comcast's alleged wrongdoing in a like manner and each of whom has the same interest as the balance of the class in establishing Comcast's liability and obtaining relief.

While those not subject to Comcast's Motion to Compel Arbitration face less risk and thus would receive greater damages under the proposed settlement allocation, that distinction does not constitute a "fundamental" conflict. There is a valid basis for distinguishing between Plaintiffs whose claims would be, for all practical purposes, foreclosed entirely were they subject to individual arbitrations and Plaintiffs whose claims could never be subject to individual

23

arbitrations and thus do not face that substantial risk.

Accordingly, all four elements of Rule 23(a) are satisfied.

**B.      The Requirements of Rule 23(b)(3) are Likewise Met in this Settlement Context**

Having satisfied the four requirements of Rule 23(a), the proposed Class must also meet the requirements of at least one of the subsections of Rule 23(b).  Under Rule 23(b)(3), a class may be certified where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  As noted above, in the context of evaluating certification of a proposed settlement class, Rule 23(b)(3)'s trial manageability need not be considered, since a settlement would render that issue moot.  *See Amchem*, 521 U.S. at 620.

**1.      The questions of law and fact that are common to the Class predominate over individual issues**

The predominance inquiry aims to determine whether a proposed class is sufficiently cohesive that it may be adjudicated by representative plaintiffs.  *Hydrogen Peroxide,* 552 F.3d at 310-11 (citing *Amchem,* 521 U.S. at 623).  The predominance requirement is "parallel" to Rule 23(a)(2)'s commonality prong, but requires a more rigorous analysis by the reviewing court. *Sullivan,* 667 F.3d at 297.

The question as to predominance is whether proof of the essential elements of the cause of action appropriately may be handled on a class-wide basis, rather than requiring individualized treatment.  *Hydrogen Peroxide,* 552 F.3d at 311.  While the Third Circuit has made clear that a finding of predominance is not a foregone conclusion in antitrust cases, it has also observed the Supreme Court's recognition that predominance frequently is met in such

cases.  *Id.* at 321-22 (citing *Amchem,* 521 U.S. at 625).  "This is because these types of claims typically arise from an alleged common course of conduct on the part of the defendant, and depend upon common proof of liability, such as evidence of the defendants' conduct." *Processed Egg Prods.*, 284 F.R.D. at 292.

The elements of the federal antitrust claim in this case are (1) a violation of § 1 of the Sherman Act, (2) individual injury (*i.e.*, antitrust impact) resulting from that violation, and (3) measurable damages.

"[A] tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product. . . ."  *N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5 (1958).  Antitrust concerns over tying arrangements arise when the seller can use its market power in the tying market (here, Premium Cable) to force buyers to purchase the tied product (here, set-top boxes) that they otherwise would not, thereby restraining competition in the tied product market.  *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 510 (3d Cir. 1998).

> *Per se* liability exists where the defendant is found to have appreciable market power in the tying market.  In such cases, the ability to leverage this power to restrain trade in the tied market is presumed and no inquiry need be made into the actual prevailing market conditions in that market.  *See Jefferson Parish,* 466 U.S. at 15–18 & n. 25, 104 S.Ct. at 1559–61 & n. 25; *Town Sound,* 959 F.2d at 477. Where appreciable tying market power cannot be shown, inquiry into the tied product market cannot be avoided, and the plaintiff therefore has the more difficult burden of showing that the arrangement violated the rule of reason because it unreasonably restrained competition in the tied product market.  *See Jefferson Parish,* 466 U.S. at 29, 104 S.Ct. at 1567.

*Id.* at 511.

Section 17200 of the California Business and Professions Code "borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL."  *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1383 (Cal. App. 2d Dist. 2012) (citation

omitted). '"[V]irtually any law or regulation – federal or state, statutory or common law – can serve as [a] predicate for a . . . [section] 17200 'unlawful' violation.'" *Id.* (citations omitted). This includes the Sherman Act.

The law of Washington is guided by federal antitrust law. *State v. Black,* 100 Wash.2d 793, 799, 676 P.2d 963, 967-68 (Wash. 1984) (noting that RCW 19.86.030 prohibiting contracts or conspiracies in restraint of trade is State's equivalent of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and that the Legislature "anticipated that our courts would be guided by the interpretation given by federal courts to their corresponding federal statutes"). That holds true for tying claims made under Washington law. *Ridgeview Properties v. Starbuck*, 96 Wash.2d 716, 720-21, 638 P.2d 1231, 1234 (Wash. 1982) (exclusively citing federal cases to describe a tying claim under Washington law).

Similarly, the West Virginia Legislature has directed its state courts to apply federal decisional law in conjunction with West Virginia antitrust statutes. *Gray v. Marshall Cnty. Bd. Of Educ*., 179 W.Va. 282, 286, 367 S.E.2d 751, 755 (1988) ("West Virginia antitrust statutes 'shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal anti-trust statutes'"); W.Va. Code 47-18-16 (1978). This principle has been applied in a West Virginia Supreme Court of Appeals antitrust decision concerning tying arrangements. *See Kessel v. Monongalia Cnty. Gen. Hosp. Co.*, 220 W.Va. 602, 608-609, 648 S.E.2d 366, 374 (2007).

Plaintiffs' burden in moving for class certification is not to *prove* each of these elements, but to demonstrate that Plaintiffs would be *capable* of proving them through common, rather than individualized proof.

Here, common issues of liability predominate over any individual issues. If an individual Plaintiff proves that Comcast unlawfully tied the sale of its Premium Cable services to the rental of a Comcast set-top box, that proof would be the same for any other person seeking to establish that fact. Likewise, if an individual Plaintiff were to prove that this unlawful tying permitted Comcast to reap supracompetitive prices from its Premium Cable subscribers, that proof of injury likewise would be the same for every other Premium Cable subscriber. Thus, where all Class members' claims are premised upon their injury resulting from Comcast's conduct in preventing competition from entering the market for set-top boxes, there can be little doubt that predominance is sufficiently demonstrated and that certification is appropriate.

2.      **Class treatment of this matter is the best method to achieve judicial efficiency and ensure that all Plaintiffs have the opportunity to assert their claims**

The superiority requirement tests whether a class action, as opposed to individual litigation or other available methods of adjudication, is the best method for achieving a fair, efficient adjudication of a controversy. *See Processed Egg Prods.,* 284 F.R.D. at 293 (citing *Newton,* 259 F.3d at 191). Rule 23(b) sets forth the factors relevant to this inquiry, which (absent manageability, which need not be considered here, *Amchem,* 521 U.S. at 620) include:

- class members' interests in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already begun by or against class members; and

- the desirability (or not) of concentrating the litigation of the claims in the particular forum.

Fed. R. Civ. P. 23(b)(3)(A)-(C). Effectively, "[t]he superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of

alternative available methods of adjudication." *Processed Egg Prods.,* 284 F.R.D. at 293-94 (quoting *Prudential,* 148 F.3d at 316).

This case satisfies the "superiority" requirement. Handling this case as a class action will achieve economies for both the litigants and the Court, avoiding hundreds of thousands of individual adjudications that would dismally clog the system. *See Processed Egg Prods.,* 284 F.R.D. at 294 (where class members numbered perhaps over 13,000 and were geographically widely disbursed, individual adjudications would have been a "potentially crushing strain on and inefficient application of judicial resources").

In addition, the claims here are low-dollar-value claims, relative to the costs of prosecuting an antitrust lawsuit, as discussed at length in Plaintiffs' briefing in opposition to Comcast's Motion to Compel Arbitration (*see* Doc. Nos. 128, 133). In such circumstances, "a class action facilitates spreading of the litigation costs among the numerous injured parties and encourages private enforcement of the statutes." *In re Warfarin Antitrust Litig.,* 391 F.3d 516, 534 (3d Cir. 2004). This concept is especially relevant in this case.

As discussed extensively in Plaintiffs' opposition to Comcast's Motion to Compel Arbitration, absent the class procedure, the vast majority of Class members will be effectively foreclosed, by both litigation (particularly expert economic) costs and the inability to find counsel, from pursuing their claims. Class treatment is thus the only practical means through which Plaintiffs' claims can be effectively resolved. For this reason, to date, there has been no interest by individual plaintiffs to separately prosecute these actions.

Even if this practical hurdle did not exist, settlement on a class basis is superior to individual litigation and adjudication because it provides Class members with prompt compensation for their injuries. By contrast, compensation resulting from litigation is highly

uncertain and may not be received before lengthy trial and appellate proceedings are complete.

There are numerous risks that Plaintiffs' cases might never get to trial and the risks the Plaintiffs

would face on appeal are even greater.  Therefore, class treatment of this matter is the best

method to achieve judicial efficiency and ensure that Plaintiffs and the Class have the

opportunity to assert their claims.

        **C.**      **Proposed Co-Lead Class Counsel Meet the Requirements for Appointment Under Rule 23(g)**

Plaintiffs respectfully submit that the proposed Co-Lead Class Counsel, Dianne M. Nast

of NastLaw LLC, Kenneth A. Wexler of Wexler Wallace LLP and Stephen A. Corr of Stark &

Stark meet the requirements for appointment under Rule 23(g), for the reasons set forth above in

the discussion of Rule 23(a)'s adequacy requirement.

## II.      PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE

Federal courts favor class action settlements.  *Ehrheart v. Verizon Wireless*, 609 F.3d

590, 594-95 (3d Cir. 2010) (recognizing the "strong presumption in favor of voluntary settlement

agreements" and noting that it is "especially strong" in the context of class action cases).

Approval of a class action settlement is a two-step process, the first involving preliminary

approval of the settlement and its related processes (such as notice, the claim form, a deadline for

submitting objections, and the schedule for a final fairness hearing), and the second being final

approval of the settlement after a fairness hearing.  *See Gates v. Rohm & Haas Co.*, 248 F.R.D.

434, 438 (E.D. Pa. 2008); *Curiale v. Lenox Group, Inc.*, Civ. A. 07-1432, 2008 WL 4899474, at

*4 (E.D. Pa. Nov. 14, 2008).  These preliminary and final procedures are summarized in the

*Manual for Complex Litigation, Fourth* (2004) § 21.6 ("*Manual*"), the Federal Judicial Center

publication designed to aid federal judges in the management of complex litigation.

A class action settlement warrants final approval if it is "fair, reasonable and adequate." Fed. R. Civ. P. 23(e)(2).  At the preliminary approval stage, however, a court does not have to reach a final conclusion as to the fairness of the settlement.  It only has to make a preliminary evaluation as to whether the proposed settlement is within the range of possible approval and free of obvious deficiencies or reasons to doubt its fairness.  *Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467, 472 (E.D. Pa. 2007); *Curiale,* 2008 WL 4899474, at *4; *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 1068807, at *2 (E.D. Pa. May 11, 2004); *Thomas v. NCO Fin. Sys., Inc.*, Civ. A. 00-5118, 2002 WL 1773035, at *5 (E.D. Pa. July 31, 2002).  If a settlement falls within the range of possible approval, at this stage it is deemed fair, reasonable and adequate to the class and notice should be given to class members to allow them the opportunity to learn about and comment on the proposed settlement.  *Samuel v. Equicredit Corp.*, No. Civ. A. 00-6196, 2002 WL 970396, at *1 n.1 (E.D. Pa. May 6, 2002).

In considering whether to give preliminary approval, the appropriate considerations include those of fairness and whether: (1) the settlement negotiations occurred at arm's length, (2) there was sufficient discovery, and (3) the proponents of the settlement are experienced in similar litigation.  *Gates*, 248 F.R.D. at 439; *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003); *Curiale*, 2008 WL 4899474, at *9.[8]

The settlement proposed in this case meets these factors.

---

[8]  These same cases also provide that where only a small fraction of the class has objected, this is an additional factor warranting preliminary approval.  *Gates*, 248 F.R.D. at 439; *Linerboard*, 292 F. Supp. 2d at 638; *Curiale,* 2008 WL 4899474, at *9.  While no objections have been received to date, the deadline for submitting objections is generally established upon preliminary approval, after notice of the settlement has been provided, consistent with the schedule that Plaintiffs propose here.  Under these circumstances, the appropriate time for considering objections (if any) would be after the deadline for submitting objections has passed.

A.      **The Proposed Settlement and Plan of Distribution Satisfy a Preliminary Evaluation of Reasonableness**

At the final approval stage, a multi-factor test (established in the seminal case of *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir. 1975)) applies to determine whether a settlement ultimately should be approved.  *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 258 (3d Cir. 2009).  At the present stage, however, "the Court need not address these factors, as the standard for preliminary approval is far less demanding."  *Gates*, 248 F.R.D. at 444 n.7.  Preliminary approval is not a binding commitment to final approval, but merely a determination that the settlement has no obvious shortcomings and generally appears to be reasonable.  *Id.* at 438.

Here, the proposed Settlement has no such shortcomings and appears reasonable.  As discussed above, it provides actual value for Class and Subclass members in the form of credits that can be used to purchase a variety of Comcast premium cable services.

This Court recently had reason to consider preliminary approval of another proposed class action settlement.  *In re Nat'l Football League Players' Concussion Injury Litig.*, MDL 2323, 2014 WL 114351 (E.D. Pa. Jan. 14, 2014).  There, the Court denied preliminary approval over concerns that the fund would be insufficient to pay benefits to the injured class members.  *Id.* at *6.  These concerns arose because the level of injury to all NFL player class members was not known, raising the Court's concerns that the fund would be depleted before all benefits due would be paid.  *Id.*  Such concerns are not present in this case because here there are no prospective injuries that may appear later to deplete the fund.

Plaintiffs, if the Class is certified and the settlement preliminarily approved, also intend to file a motion for an award of attorney fees, costs and expenses, to combined total of which will not exceed $2,746,000.00.  Based on the $43 million value of the Settlement, the combined attorney fees, costs and expenses are capped at 6.39% of the Settlement.  The attorney fees, costs

and expenses will be paid separately by Comcast and will not result in a reduction of benefits to Class members.

In that motion, Plaintiffs also plan to request that the Court to approve payments of $1,000.00 each to named Plaintiffs James E. Deanne, Debra Koller, Leopoldo Herrera and Daniel Steele for their efforts in prosecuting this litigation on behalf of the Class. *See Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000) ("Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.") (citations, internal quotations omitted).

Overall, the Settlement represents an excellent result for the proposed Class.

### B.      The Settlement is the Result of Arm's-Length Negotiations

Whether a settlement arises from arm's-length negotiations is often the central focus of the analysis on a motion for preliminary approval. *Mehling*, 246 F.R.D. at 472; *Curiale*, 2008 WL 4899474, at *4. An examination of the circumstances surrounding the present settlement confirms that the negotiations here support preliminary approval.

The proposed Settlement is the result of non-collusive, good faith efforts between adversaries to resolve the case, and was reached only after robust negotiations encouraged by this Court and guided by an independent and experienced mediator. This factor thus supports preliminary approval. *See Gates,* 248 F.R.D. at 444 (granting preliminary approval to a settlement following two days of mediation where there was "nothing to indicate that the proposed settlement . . . [was] not the result of good faith, arms-length negotiations between adversaries," and the Court had no reason to doubt that the settlement involved the same "vigorous and independent lawyering" that characterized the nearly two years of litigation preceding settlement).

**C.      The Settlement in this Case was Reached after the Provision of Sufficient Information, Through Discovery or Discussion with Comcast.**

This MDL has been pending for almost five years, and has involved sufficient discovery and exchange of information to support this Settlement.  While the formal discovery has involved the issue of Comcast's Arbitration Clause, there has been extensive discussion with Comcast, in the course of the mediation and settlement efforts, about technology and other matters relevant to Plaintiffs' claims.

Moreover, Plaintiffs have learned additional information about technology issues and their antitrust tying allegations, albeit on a less formal basis, that has informed them of the substantial risks of continued litigation, and the realistic risk that nothing might be recovered were they to proceed.  As part of the Settlement Agreement, Comcast has also agreed to produce a witness for deposition to confirm its allegations about the technology issues.

Finally, numerous legal developments have occurred during the course of this case, including the issuance of the *Concepcion*, *Cox* and *AmEx III* decisions discussed above, and bear on Plaintiffs' knowledge.  While these legal opinions are not discovery, they are comparable to it in many respects, further shedding light on Plaintiffs' ability, practically and successfully, to pursue their case.

Where appropriate, other Courts have granted preliminary approval of settlements before the undertaking of formal merits discovery.  *See, e.g., Gates,* 248 F.R.D. at 444 (granting preliminary approval of settlement reached before discovery on the merits); *Thomas*, 2002 WL 1773035, at *5 (granting preliminary approval of settlement where there was "no reference to any formal discovery").  Such approval would also be appropriate here.

### D.      The Parties are Experienced in Similar Litigation

The negotiations were conducted for Plaintiffs by counsel with extensive experience in litigating antitrust lawsuits, class actions, and other complex cases. Proposed Co-Lead Class Counsel and their co-counsel know how to pursue a case of this type and are intimately familiar with the strengths and weaknesses of this case in particular.  The extensive experience of class counsel in litigating similar cases, while not dispositive, suggests a fair settlement.  *Fisher Bros. v. Phelps Dodge Indus., Inc.,* 604 F. Supp. 446, 452 (E.D. Pa. 1985) ("[T]he professional judgment of counsel involved in the litigation is entitled to significant weight.").

Proposed Co-Lead Class Counsel and their co-counsel firmly believe that the proposed Settlement is fair, reasonable, and adequate, and should be approved.  Courts in other cases have found it appropriate to consider strongly the recommendations of experienced counsel who have negotiated arm's-length settlements.  *See, e.g., Lake v. First Nationwide Bank*, 156 F.R.D. 615, 628 (E.D. Pa. 1994) (giving "due regard to the recommendations of the experienced counsel . . . who have negotiated this settlement at arms-length and in good faith"); *Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997) ("A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.") (citation, internal quotation omitted).  This factor also supports settlement.

## III.    THE PROPOSED FORM AND MANNER OF NOTICE AND SCHEDULE ARE REASONABLE

Under Rule 23(e), class members are entitled to reasonable notice of class certification and a proposed settlement before it is finally approved by the Court, as well as of the final fairness hearing and the opportunity to present their views. *Manual* §§ 21.312, 21.633.  "[T]he Rule 23(e) requirement is designed to summarize the litigation and the settlement and to apprise

class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Gates*, 248 F.R.D. at 445 (citations, internal quotation marks omitted).  "[T]o satisfy due process, notice to class members must be reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 174 (E.D. Pa. 2000) (citations, internal quotations omitted).  *See also Mehling*, 246 F.R.D. at 477 (approving proposed notice for settlement class when notice "adequately informs potential class members in clear, understandable language.")

Individual notice should be provided wherever practicable.  *Manual,* § 21.312; *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 491 (E.D. Pa. 2003) ("The due process requirements of Federal Rule of Civil Procedure 23 demand that, prior to final approval of a class action settlement, class members be given the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable efforts."); *Ikon Office Solutions*, 194 F.R.D. at 175 ("In 23(b)(3) actions, class members must receive the best notice practicable under the circumstances, including individual notice to all . . . [class members] who can be identified through reasonable effort.") (citations, internal quotations omitted); *Thomas*, 2002 WL 1773035, at *7 ("The requirement that individual notice be sent to all class members whose names and addresses may be ascertained with reasonable effort is mandatory.").

The Notice provided under the Settlement meets all such requirements.

### A.    Plaintiffs Propose Providing Two Forms of Notice

First, Comcast will provide Notice of the proposed Settlement to Class members in their monthly bill.  The Notice will direct Class members to a Settlement website that will have a

more robust exposition of the Settlement terms.  *See* Exhibit C to the Settlement Agreement.

Second, Notice will be provided to Class members by establishing an Internet Settlement website that will display the following: (i) Notice in a form substantially similar to Exhibit D to the Settlement Agreement; (ii) contact information for Co-Lead Class Counsel, in the form of firm name, attorney name, a phone number, address, e-mail address, and website address; (iii) a complete copy of the Settlement Agreement; (iv) frequently asked questions; and (v) a Claim Form that can be submitted electronically.

Class members therefore will receive ample notice of class certification and the proposed Settlement.  *See In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450, 527 (D.N.J. 1997), *aff'd,* 148 F.3d 283, 311 (3d Cir. 1998) (notice is sufficient where it informs class members of the nature of the litigation, the general terms of the settlement, where complete information can be located, the time and place of the final fairness hearing, and the opportunity for objectors to be heard); *see also Nichols v. SmithKline Beecham Corp.*, Civ. A. 00-6222, 2005 WL 950616, at *9 (E.D. Pa. Apr. 22, 2005) (same as *Prudential*).

### B.  The Proposed Notice Plan Assures that Class Members will Receive Adequate Notice of the Settlement

The proposed Notice Plan meets all legal requirements, and the Notices themselves provide a comprehensive explanation of the Settlement in layperson's terms, including that Plaintiffs' counsel may seek up to $2,746,000.00 in attorney fees, costs and expenses, to be paid separately by Comcast.  The proposed notice materials are based on samples promulgated by the Federal Judicial Center.[9]  They explain the case in "clear, concise, easily understood language,"[10]

---

[9] *See* Federal Judicial Center Website, Class Action Notices Page, www.fjc.gov.

[10] *See* Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide, at 5 (Federal Judicial Center 2010), available at:
http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf

36

and fairly apprise Class members of the Settlement's terms and their options in connection with the proceedings, including the opportunity to object and attend and participate in the Final Fairness Hearing.  The materials are also neutral and convey no opinion of the Court about the Settlement.

### C.   It would be Appropriate to Approve the Claim Form, and Plan of Distribution and Authorize the Class Administrator to Disseminate Notice of the Settlement and Receive and Process Class Member Claims

Attached as Exhibit A to the Settlement Agreement is a Claim Form, which Plaintiffs propose each Class member seeking to participate in the Settlement should be required to complete and submit to the Claims Administrator, at the address specified in the Class Notice, postmarked no later than the deadline set forth on the Claim Form.

Plaintiffs request that the Court appoint Epiq Systems, Inc. ("Epiq") as the Claims Administrator and authorize it to disseminate Notice of the Settlement and receive and process Class member claims.  Epiq has experience in many other class actions, including other similar antitrust cases.  *See, e.g., In re Natural Gas Antitrust Cases I – IV*, Case Nos. 4221, 4224, 4226 and 4228 (Ca. Sup. Ct.); *In re Western States Wholesale Natural Gas Antitrust Litig.*, Case No. 2:03-cv-1431 (D. Nev.).[11]

### D.   The Proposed Schedule is Reasonable

Preliminary approval includes setting the deadlines for providing notice to the class, objecting to class certification or the settlement, submitting papers related to final approval and an award of attorney fees and costs, and submitting claims, as well as the date for the final fairness hearing.  That hearing will provide a forum for proponents and opponents (if any) of the

---

[11] Additional information about Epiq may be found on the firm's website: www.epiqsystems.com.

Settlement to address its terms, including its fairness, adequacy, and reasonableness, as well as the motion for attorney fees and costs.

Plaintiffs propose, and seek the Court's approval of, the following schedule for these events:

|    | Event | Timing |
|----|-------|--------|
| 1 | Renewed motion for preliminary approval filed | February 24, 2014 |
| 2 | Notice to be posted on www.SetTopBoxSettlement.com | 90 days after entry of an order granting Preliminary Approval |
| 3 | Notice to be published and inserted in monthly bill | 120 days after entry of an order granting Preliminary Approval |
| 4 | Deadline for filing motions for final approval and for attorney fees and reimbursement of expenses | 150 days after entry of an order granting Preliminary Approval |
| 5 | Postmark deadline for objections, opt-outs and notices of intent to appear at final fairness hearing | 180 days after entry of an order granting Preliminary Approval |
| 6 | Deadline to Report to Court on opt-outs | 21 days after the opt-out deadline |
| 7 | Deadline for responding to any objections | No fewer than 5 days before Final Fairness Hearing |
| 8 | Final Fairness Hearing | Plaintiffs respectfully request this hearing be scheduled in September 2014, should the Court's schedule permit |
| 9 | Postmark deadline for filing claims | 60 days after Final Fairness Hearing |
| 10 | Date by which attorney fees will be paid | 30 days after Effective Date, as defined in the Settlement Agreement |
| 11 | Date by which Class members will receive checks or credits | 120 days after Effective Date, as defined in the Settlement Agreement |
| 12 | Deadline to dispute Settlement credits or benefits | 30 days after issuance of credits or benefits |

| 13 | Expiration of Settlement credits | Settlement Credits will be valid for one (1) year after their issuance, after which they expire by their own terms |
|---|---|---|

## **CONCLUSION**

Plaintiffs respectfully request that the Court certify the proposed Settlement Class and grant preliminary approval of the parties' Settlement.  The Settlement falls well within the range of possible approval, there are no grounds to doubt its fairness, and it was negotiated at arm's length by experienced counsel who support it.

The form of Notice, plan for dissemination of Notice to the Class and Claim Form each warrant approval, and it would be appropriate to appoint Epiq as Claims Administrator and allow it to disseminate Notice and receive and process Class member claims.  Finally, it would be appropriate to establish a schedule for the submission of objections and completing the settlement approval process, including the Final Fairness Hearing.

February 24, 2014

Respectfully submitted,

*/s/ Dianne M. Nast*

Stephen A. Corr
John A. Corr
Stark & Stark
777 Township Line Road
Yardley, Pennsylvania 19067

*Plaintiffs' Liaison Counsel*

Kenneth A. Wexler
Edward A. Wallace
Amy E. Keller
Wexler Wallace LLP
55 West Monroe Street, Suite 3300
Chicago, Illinois 60602

Dianne M. Nast
Erin C. Burns
NastLaw LLC
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107

*Plaintiffs' Lead Counsel*

Joe R. Whatley, Jr., Esquire
Whatley Kallas LLP
1180 Avenue of the Americas, 20th Floor
New York, New York 10036

Michael L. Murphy
Bailey & Glasser, LLP
910 17th Street, N.W.
Washington, District of Columbia 20006

Harry F. Bell, Jr.
William L. Bands
Jonathan W. Price
The Bell Law Firm, PLLC
30 Capitol Street
Charleston, West Virginia 25301

Joseph F. Devereux, Jr.
Devereux Murphy LLC
101 South Hanley, Suite 400
Clayton, Missouri 63105

John F. Edgar
Michael D. Pospisil
Edgar Law Firm LLC
1032 Pennsylvania Avenue
Kansas City, Missouri 64105

Robert M. Foote
Kathleen C. Chavez
Foote, Mielke, Chavez & O'Neil, LLC
10 West State Street, Suite 200
Geneva, Illinois 60134

Daniel E. Gustafson
Karla M. Gluek
Michelle J. Looby
Gustafson Gluek, PLLC
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, Minnesota 55402

Leonard V. Fodera
Fodera & Long
1500 Walnut Street, Suite 900
Philadelphia, Pennsylvania 19102

William M. Sweetnam
Sweetnam LLC
582 Oakwood Avenue, 200
Lake Forest, Illinois 60045

Daniel E. Becnel, Jr.
Matthew B. Moreland
Becnel Law Firm
P.O. Drawer H
Reserve, Louisiana 70084

Dennis G. Pantazis
Brian M. Clark
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203

Peter Macuga
Macuga, Liddle & Dubin, P.C.
975 East Jefferson Avenue
Detroit, Michigan 48207-3101

*Plaintiffs' Steering Committee*

Anthony J. Medico
Frank Napolitano
The Law Offices of
Medico & Napolitano, LLC
7 Benedict Place
Greenwich, CT 06830

Guido Saveri
Saveri & Saveri, Inc.
706 Sansome Street
San Francisco, California 94111


Robert S. Kitchenoff
Weinstein Kitchenoff & Asher LLC
1845 Walnut Street
Suite 1100
Philadelphia, Pennsylvania 19103

Brian G. Weber
Johns, Flaherty, & Collins, SC
Exchange Building
Suite 600, 205  5th Avenue South
P.O. Box 1626
La Crosse, Wisconsin 54602

Stephen W. Mullins
Luckey & Mullins, PLLC
Post Office Box 990
Ocean Springs, Mississippi 39566

Natalie Finkelman Bennett
Shepherd, Finkelman, Miller & Shah, LLP
35 East State Street
Media, Pennsylvania 19063

*Additional Plaintiffs' Counsel*