**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| _____ | : | |
| IN RE: COMCAST CORP. SET-TOP | : | |
| CABLE TELEVISION BOX | : | CIVIL ACTION |
| ANTITRUST LITIGATION | : | NO. 09-md-2034 |
| _____ | : | |

**September 24, 2019**                                      **Anita B. Brody, J.**

## <u>MEMORANDUM</u>

Plaintiffs James E. Deanne, William Gonzales, John Martich, and Carrie D. Cooper (collectively, "Plaintiffs"), on behalf of themselves and the putative class members they seek to represent, have negotiated and agreed to a Fourth Amended Class Action Settlement Agreement ("Settlement Agreement") with Defendants Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications, Inc., and Comcast Cable Communications Holdings, Inc. (collectively, "Comcast") in this multidistrict litigation ("MDL").  On September 5, 2018, I preliminarily certified the Settlement Class and preliminarily approved the Settlement Agreement.  Plaintiffs now move for class certification and final approval of the Settlement. Additionally, Plaintiffs move for attorneys' fees, reimbursement of expenses, and incentive awards to class representatives.

Out of an estimated 3.5 million potential Class Members, 20,262 individuals have filed claims, fifty-nine individuals have opted out of the proposed Settlement, and four individuals have filed three objections to the Settlement.[1]  On September 10, 2019, the Court held a final

---

[1] The objectors are Edward W. and Darlene D. Orr, Katherine Michelle Budney, and Jean Saben.  The Orrs filed a joint objection to the Settlement.

fairness hearing.[2]  For the below reasons, I will grant Plaintiffs' motion for class certification and final approval of the Settlement.  I will also grant Plaintiffs' motion for attorneys' fees, reimbursement of expenses, and incentive awards to class representatives.

# I. BACKGROUND

Comcast is the largest provider of cable multi-channel video programming distribution in the United States, servicing over twenty-four million customers in thirty-nine states and the District of Columbia.  Comcast provides cable services in exchange for a monthly fee based upon the level of service provided.  Comcast provides two cable products, Basic Cable and Premium Cable.  Customers who subscribe to Premium Cable pay higher monthly fees than those who subscribe only to Basic Cable.  Customers who subscribe to Premium Cable have access to high-definition channels, On Demand, numerous specialty channels, an interactive programming guide, and the ability to purchase pay-per-view programs and additional channels, like HBO.  For many years, Premium Cable customers had to rent a cable television set-top box ("Set-Top Box") from Comcast in order to access Premium Cable.[3]  The Set-Top Box enables Premium Cable subscribers to view Premium Cable content and use Premium Cable services.

In 2008, individuals began filing lawsuits against Comcast, alleging that Comcast unlawfully tied the sale of Premium Cable to the rental of a Set-Top Box from Comcast.  On June 17, 2009, the Judicial Panel on Multidistrict Litigation transferred and consolidated these

---

[2] Only one objector, Edward W. Orr, participated in the final fairness hearing.  To accommodate his disability, the Court allowed him to participate via telephone.

[3] On June 5, 2019, pursuant to the confirmatory discovery provision of the Settlement Agreement, Plaintiffs took the deposition of Comcast's corporate designee, Jack Birnbaum.  During the deposition, Mr. Birnbaum explained that Comcast customers no longer need to rent a Set-Top Box to access Premium Cable and can now use devices like Roku and TiVo to access services.  Jack Birnbaum Dep., ECF No. 277-2 at 11:24-14:4.

lawsuits before me as a multidistrict litigation, pursuant to 28 U.S.C. § 1407.  *See* MDL Panel

Transfer Order, ECF No. 1.  In total, twenty-four civil actions were consolidated into this MDL.[4]

On November 23, 2009, Plaintiffs filed a First Amended Consolidated Class Action

Complaint.  *See* First Am. Consolidated Class Action Compl., ECF No. 26.  On September 30,

2010, Plaintiffs filed a Second Amended Consolidated Class Action Complaint.  *See* Second Am.

Consolidated Class Action Compl., ECF No. 109.  On June 10, 2011, Plaintiffs filed a Third

Amended Consolidated Class Action Complaint.  *See* Third Am. Consolidated Class Action

Compl., ECF No. 122.  On October 24, 2017, Plaintiffs filed the currently operative Fourth

Amended Consolidated Class Action Complaint ("Complaint"), alleging that Comcast's

unlawful tying arrangement violates Section 1 of the Sherman Act, 15 U.S.C. § 1, the antitrust

and consumer protection laws of the State of Washington, the Business & Professions Code of

the State of California, and the Consumer Credit and Protection Act of the State of West

Virginia.  *See* Compl., ECF No. 253.

From the outset of the class action, Comcast sought arbitration of certain claims.  On

January 6, 2010, Comcast moved to compel arbitration.  *See* Mot. Compel, ECF No. 35.  On July

22, 2011, after the filing of Plaintiffs' Third Amended Consolidated Class Action Complaint,

Comcast filed a new motion to compel arbitration.  *See* Mot. Compel, ECF No. 127.  During

2010 and 2011, the parties engaged in discovery only regarding arbitration.

---

[4] On October 16, 2014, I entered an order approving and adopting the parties' stipulation of dismissal without prejudice of nineteen of the twenty-four civil actions.  *See* Stipulation for Dismissal Order, ECF No. 201.  On October 12, 2017, I entered an order voluntarily dismissing without prejudice the claims in another one of the twenty-four civil actions.  *See* Voluntary Dismissal Order, ECF No. 252.  On November 13, 2017, I entered an order approving the parties' stipulation of dismissal without prejudice of two additional actions.  *See* Stipulation for Dismissal of Certain Pls. Order, ECF No. 258.  Only two of the twenty-four civil actions remain pending: *Deanne v. Comcast Corp., et al.*, No. 09-3659 and *West Virginia ex rel. McGraw v. Comcast Corp., et al.*, No. 09-4671.

From January 2012 through September 2012, the parties engaged in five formal mediation sessions before Thomas Rutter, Esquire, of ADR Options in Philadelphia. Thereafter, the parties continued to engage in settlement negotiations.

During the pendency of this class action, the Supreme Court of the United States twice addressed key questions about arbitration in the cases *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) and *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013). While the parties awaited the Supreme Court's decisions in *Concepcion* and *Italian Colors*, significant delay occurred in the litigation and the settlement negotiations. *See, e.g.,* Stipulation and Order, ECF No. 114 (staying the case until the Supreme Court rendered its decision in *Concepcion*).

In *Concepcion*, the Supreme Court held that the Federal Arbitration Act ("FAA") prohibits a State from conditioning the enforceability of an arbitration agreement on the availability of classwide arbitration procedures. *Concepcion*, 563 U.S. at 344. In *Italian Colors*, the Supreme Court further held that the FAA prohibits courts from invalidating a contractual waiver of class arbitration on the basis that the cost of individually arbitrating a federal statutory claim exceeds the potential recovery. *Italian Colors*, 570 U.S. at 233-39.

On November 12, 2014, in response to the recent Supreme Court jurisprudence of *Concepcion* and *Italian Colors*, Comcast filed a renewed motion to compel arbitration, seeking, for the first time, to compel arbitration of the Washington state law claims. *See* Mot. Compel, ECF No. 209. On October 27, 2015, Comcast filed a supplemental motion to compel arbitration, seeking, for the first time, to compel arbitration of the California state law claims. *See* Supp. Mot. Compel, ECF No. 231. Although Comcast previously sought only to compel individual arbitration of the Sherman Act claim, Comcast asserted that *Italian Colors* was an intervening

change in the law that justified its delayed decision to also seek arbitration of the Washington and California state law claims.

On February 22, 2018, nearly nine years after the inception of this MDL and several failed settlement attempts, the parties reached a Fourth Amended Class Action Settlement Agreement. Preliminary Approval Mot., ECF No. 266. At Plaintiffs' insistence, the Settlement Agreement permitted Plaintiffs to take confirmatory discovery of a corporate representative, pursuant to Federal Rule of Procedure 30(b)(6), to enable Plaintiffs to ascertain whether they had accurately assessed the strengths and weaknesses of their case when deciding to settle. *See* Fourth Am. Class Action Settlement Agreement § 8, ECF No. 266 Ex. 1. ¶ 8 [hereinafter Agreement]. Plaintiffs also were permitted to terminate the Settlement Agreement within ten days after confirmatory discovery if they determined "based upon the answers given, that this Settlement Agreement is not in the best interest of the class as a whole." *Id.*

On September 5, 2018, the Court preliminarily certified the Settlement Class and preliminarily approved the Settlement Agreement. Preliminary Approval Mem., ECF No. 268; Preliminary Approval Order, ECF No. 269. The Court, however, denied approval of the proposed Notice and the proposed Claim Form and ordered Plaintiffs to submit revised notice materials that satisfied the requirements of Federal Rule of Civil Procedure 23 and due process. *Id.* On January 10, 2019, the Court approved Plaintiffs' revised notice materials because they satisfied the requirements of Rule 23(c)(2)(B) and due process. Order Approving Revised Notice Materials, ECF No. 276.

On June 5, 2019, pursuant to the confirmatory discovery provision of the Settlement Agreement, Plaintiffs took the deposition of Comcast's corporate designee, Jack Birnbaum. Plaintiffs deposed Mr. Birnbaum on the following relevant topics: changes to the Set-Top Boxes

since the filing of this action; the market for selling Set-Top Boxes; and the compatibility of different Set-Top Boxes with the cable television plans offered by Comcast. Jack Birnbaum Dep., ECF No. 277-2. "That sworn deposition confirmed what Plaintiffs had already concluded, that many of the risks they face could end this litigation for Plaintiffs and the putative class altogether, resulting in no recovery at all." Final Cert. and Final Approval Mem. 8, ECF No. 277-1. As a result, on June 7, 2019, Plaintiffs moved forward with the Settlement and filed their motion for class certification and final approval of the Settlement.

## II. PROPOSED CLASS ACTION SETTLEMENT

### A. Proposed Settlement Class

The parties define the Settlement Class as follows:

All persons who:

> (i) resided in and subscribed to Premium Cable in California, Washington, or West Virginia during the Class Period, or

> (ii) subscribed to Premium Cable in any state in the United States during the Class Period and elected to opt out of Comcast's arbitration clause as reflected in Comcast's records;

and paid Comcast a rental fee for a Set-Top Box at any time during the Class Period.

> Excluded from the Settlement Class are: (i) those persons who opt out of this Agreement as identified in paragraph 6; (ii) all commercial account customers; (iii) Comcast officers, directors, or employees, any entity in which Comcast has a controlling interest, and the affiliates, legal representatives, attorneys, heirs, or assigns of Comcast; (iv) Class Counsel and Class Counsel's employees; and (v) Judge Anita B. Brody and members of her judicial staff of the United States District Court for the Eastern District of Pennsylvania, as well as any federal, state, or local governmental agency, and any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staffs.

Agreement § 3.1.

**B. Proposed Settlement**

The Class Period covers all Class Members who rented a Set-Top Box anytime starting on or after January 1, 2005 and ending on September 5, 2018, the date of this Court's Order granting preliminary approval of the Settlement Agreement. *Id.* § 2.8. The Settlement is a claims-made settlement.[5] *Id.* § 9.1. Comcast will pay all claims made in the aggregate that do not exceed $15.5 million in value. *Id.* § 9.1.6. If Class Members submit more than $15.5 million worth of claims, then benefits will be distributed on a pro rata basis. *Id.* If Class Members submit less than $15.5 million worth of claims, then Comcast will retain the balance. *Id.*

All Class Members will be entitled to a cash payment and Current Subscribers[6] will have the choice of either a cash payment or in-kind relief. *Id.* § 9.1. Class Members will be entitled to a cash payment in accordance with the length of time they rented a Set-Top Box from Comcast, regardless of the number of Set-Top Boxes they rented, as follows:

> 9.1.1.1    If the Claimant rented at least one Set-Top Box from 1 to 35 months (0 to 3 years), the Claimant is entitled to ten U.S. dollars and no cents ($10.00) payable by check.
>
> 9.1.1.2    If the Claimant rented at least one Set-Top Box from 36 to 59 months (3 to 5 years), the Claimant is entitled to twelve U.S. dollars and fifty cents ($12.50) payable by check.
>
> 9.1.1.3    If the Claimant rented at least one Set-Top Box for 60 or more months (more than 5 years), the Claimant is entitled to fifteen U.S. dollars and no cents ($15.00) payable by check.

*Id.* § 9.1.1. Current Subscribers will be entitled to elect to receive in-kind relief in lieu of a cash payment. Current Subscribers will be entitled to in-kind relief in accordance with the length of

---

[5] "A 'claims-made' settlement is a settlement that does not have a fixed settlement fund, but rather provides that the defendant will pay claims of class members who file them, usually up to some fixed ceiling." 4 William B. Rubenstein, Newberg on Class Actions § 13:7 (5th ed.).

[6] Current Subscribers are "Class Members who are cable television subscribers of Comcast in the United States as of the date of the Notice provided . . . ." Agreement § 2.11.

time they rented a Set-Top Box from Comcast, and will receive additional in-kind relief if they rented more than one Set-Top Box, as follows:

9.1.2.1     If the Claimant rented at least one Set-Top Box from 1 to 35 months (0 to 3 years), the Claimant is entitled to select one of the following options:

(a) three (3) free months of Showtime (up to a maximum $30.00 value); or

(b) five (5) movie or television show rentals or purchases (up to a maximum $29.95 value).

Plus, if the Claimant rented more than one Set-Top Box, one (1) additional movie or television show rental or purchase (up to a maximum $5.99 value).

9.1.2.2     If the Claimant rented at least one Set-Top Box from 36 to 59 months (3 to 5 years), the Claimant is entitled to select one of the following options:

(a) three (3) free months of Showtime (up to a maximum $30.00 value) and one (1) movie or television show rental or purchase (up to a maximum $5.99 value) (a combined up to maximum $35.99 value); or

(b) six (6) movie or television show rentals or purchases (up to a maximum $35.94 value).

Plus, if the Claimant rented more than one Set-Top Box, two (2) additional movie or television show rentals or purchases (up to a maximum $11.98 value).

9.1.2.3     If the Claimant rented at least one Set-Top Box for 60 or more months (more than 5 years), the Claimant is entitled to select one of the following options:

(a) three (3) free months of Showtime (up to a maximum $30.00 value) and two (2) movie or television show rentals or purchases

(up to a maximum $11.98 value) (a combined up to maximum
$41.98 value); or

(b) seven (7) movie or television show rentals or purchases (up to a
maximum $37.97 value).

Plus, if the Claimant rented more than one Set-Top Box, three
(3) additional movie or television show rentals or purchases (up to
a maximum $17.97 value).

*Id.* § 9.1.2.

## III. DISCUSSION

### A. Class Certification

Plaintiffs move for certification of the Settlement Class pursuant to Rule 23(b)(3). For a

class action to have preclusive effect and bind absent class members, a class must first be

certified. Federal Rule of Civil Procedure 23(a) contains four threshold requirements for

certification:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or
defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the
class.

Fed. R. Civ. P. 23(a). Rule 23(b)(3) imposes two additional requirements: "questions of law or

fact common to class members predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy."[7] Fed. R. Civ. P. 23(b)(3). The Rule 23(b)(3) requirements are

---

[7] Ascertainability is typically a "necessary prerequisite" of a Rule 23(b)(3) class. *Byrd v. Aaron's Inc.*,
784 F.3d 154, 162 (3d Cir. 2015), *as amended* (Apr. 28, 2015). In this case, however, the Third Circuit
has concluded that ascertainability is not a proper basis to deny certification. *See* ORDER of USCA, ECF
No. 241.

commonly referred to as predominance and superiority. *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc).

"[T]he party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015). Class certification "demand[s] undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). However, the existence of a settlement means that "certain Rule 23 considerations . . . are not applicable." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 378 (3d Cir. 2013). For example, because a settlement obviates the need for trial, concerns regarding the manageability of a Rule 23(b)(3) class disappear. *See Amchem*, 521 U.S. at 619-20; *see also Sullivan*, 667 F.3d at 297 (noting that "concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004) ("[C]oncerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class" (citing *Amchem*, 521 U.S. at 620)).

The proposed Class meets the Rule 23(a) and 23(b)(3) requirements and warrants certification.

### 1. Rule 23(a) Requirements

#### a. Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the

potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v.*

*Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). The parties represent that there are

approximately 3.5 million proposed Class Members. Accordingly, Plaintiffs satisfy the

numerosity requirement of Rule 23(a).

### b. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed.

R. Civ. P. 23(a)(2). To satisfy commonality, class members' claims "must depend upon a

common contention . . . of such a nature that it is capable of classwide resolution—which means

that determination of its truth or falsity will resolve an issue that is central to the validity of each

one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Commonality may be shown by "demonstrat[ing] that the class members 'have suffered the same

injury.'" *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). A single

common question or fact is sufficient to satisfy the commonality requirement of Rule 23(a)(2).

*Wal-Mart*, 564 U.S. at 359; *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

Here, common questions of law and fact include:

a. Whether Comcast is liable to Plaintiffs and the Class for violations of federal antitrust laws;
b. Whether Comcast established an unlawful tying arrangement for the rental of set-top boxes, in violation of federal laws;
c. Whether Comcast established an unlawful tying arrangement for the rental of set-top boxes, in violation of applicable state laws;
d. Whether Comcast's actions have caused damages to Plaintiffs and the Class;
e. Whether Comcast should be enjoined from further violations of federal and state laws; and
f. Whether Comcast is liable to Plaintiffs and the Class for treble damages as a result of its violations of federal antitrust laws.

Compl. ¶ 121. Moreover, Plaintiffs allege the same harm from the same illegal conduct: the

payment of supracompetitive prices as a result of Comcast's unlawful tying of its Premium Cable

to the rental of a Set-Top Box.  Whether Comcast engaged in such conduct and Plaintiffs

suffered harm as a result are common questions of law and fact.  Thus, commonality exists.

### c. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality inquiry asks

"whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus

suggesting that the incentives of the plaintiffs are aligned with those of the class."  *Beck v.*

*Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006) (quoting *Baby Neal*, 43 F.3d at 55).

The Third Circuit has "set a low threshold for satisfying" the typicality requirement.

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001), *as*

*amended* (Oct. 16, 2001).  The typicality requirement "acts as a bar to class certification only

when 'the legal theories of the named representatives potentially conflict with those of the

absentees.'"  *Id.*  (quoting *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996),

*aff'd sub nom.*, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997)).  "If the claims of the

named plaintiffs and putative class members involve the same conduct by the defendant,

typicality is established regardless of factual differences."  *Newton*, 259 F.3d at 183-84.

Named Plaintiffs allege that they and all putative Class Members suffered economic

damages from Comcast's illegal tying arrangement.  Specifically, Plaintiffs allege that Comcast

unlawfully tied the sale of its Premium Cable to the rental of a Comcast Set-Top Box, and that

this tying arrangement enabled Comcast to reap supracompetitive profits from Plaintiffs and all

putative Class Members who were forced to pay rental fees to Comcast to enjoy Premium Cable

services.  Plaintiffs satisfy the typicality requirement because the claims of the named Plaintiffs

and the putative Class Members involve the same conduct by Comcast.

#### d. Adequacy of Representation

The final prong of Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. The adequacy of representation requirement addresses two components: (1) the qualifications of class counsel; and (2) the interests and incentives of the class representatives. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012).

#### i. Adequacy of Class Counsel

When examining settlement classes, courts "have emphasized the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant."[8] *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995).

Co-Lead Class Counsel Dianne M. Nast, Kenneth A. Wexler, and Stephen A. Corr have been involved in this litigation since its inception and were among the first counsel to file individual complaints before the creation of this MDL. Each has played an integral role in organizing and pursuing this MDL on behalf of Plaintiffs and the putative Settlement Class. Ms. Nast, Mr. Wexler, and Mr. Corr have extensive knowledge of antitrust law, complex litigation

---

[8] In 2003, Congress amended Rule 23 to include subdivision 23(g), which provides a non-exhaustive list of factors for a court to consider when scrutinizing the adequacy of class counsel's representation. *See* Fed R. Civ. P. 23(g). The addition was meant to transfer the analysis of class counsel's representation from Rule 23(a)(4), where it had little textual support, to Rule 23(g). *See* 1 William B. Rubenstein, Newberg on Class Actions § 3.80 (5th ed.). Rule 23(g) "builds on" the existing 23(a)(4) jurisprudence instead of "introducing an entirely new element into the class certification process." *See* Fed. R. Civ. P. 23(g) advisory committee's notes (2003 amendments). Accordingly, the Third Circuit continues to apply the factors relied on prior to the addition of Rule 23(g). *See In re Cmty. Bank of N. Va.*, 622 F.3d 275, 304-05 (3d Cir. 2010); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 307 (3d Cir. 2005). Class Counsel's representation of the Class satisfies both Rule 23(a)(4) and 23(g).

and class action practice, and have substantial experience handling class actions and multidistrict litigations.  *See* Pls.' Mem., ECF No. 266 Exs. 3, 4, and 5.

Throughout the course of this litigation, Ms. Nast, Mr. Wexler, and Mr. Corr have identified and investigated potential claims in the action.  In addition, in recognition of two important Supreme Court opinions on arbitration, *Concepcion* and *Italian Colors*, they have on several occasions re-examined the strength of their legal claims.

Moreover, Ms. Nast, Mr. Wexler, and Mr. Corr have vigorously prosecuted the action at arm's length from Comcast.  They have engaged in adversarial motions practice, specifically related to the arbitrability of claims of putative Class Members and participated in five formal mediation sessions before Thomas Rutter, Esquire, of ADR Options in Philadelphia, as well as other negotiation sessions with Comcast.

Accordingly, Ms. Nast, Mr. Wexler, and Mr. Corr have adequately represented the putative class.

### ii. Adequacy of Class Representatives

 "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Amchem*, 521 U.S. at 625-26 (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).  "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class."  *Dewey*, 681 F.3d at 183.  The purpose of the adequacy requirement is to identify intra-class conflicts that may prevent the representative plaintiffs from adequately representing the entire class.  *Id.* at 183-4.  "An intra-class conflict will not necessarily prevent certification if the settlement agreement contains sufficient structural protections to ensure that the interests of the class will be adequately represented despite the conflict."  *Id.* at 185.

Only a fundamental intra-class conflict will violate Rule 23(a)(4). *Id.* at 184. "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.* at 184. (quoting *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)). Additionally, "[a] conflict concerning the allocation of remedies amongst class members with competing interests can be fundamental." *Id.* Thus, a court must address two questions to determine whether the representative plaintiffs adequately represent the putative class: "(1) whether an intra-class conflict exists; and if so, (2) whether that conflict is 'fundamental.'" *Id.*

Plaintiffs James E. Deanne, William Gonzales, John Martich, and Carrie D. Cooper are adequate representatives of the proposed Settlement Class. The named Plaintiffs include both Current Subscribers and Former Subscribers from Washington, California, and West Virginia. No fundamental intra-class conflict exists because Mr. Deanne, Mr. Gonzales, Mr. Martich, and Ms. Cooper share the same strong interest in establishing Comcast's liability and seek the same type of damages for the same alleged anticompetitive conduct.

### 2. Rule 23(b)(3) Requirements

#### a. Predominance

Under Rule 23(b)(3), an opt-out class may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 623, to determine whether the proposed class "'would achieve economies of time, effort, and expense,'" *id.* at 615 (quoting Fed R. Civ. P. 23(b)(3) advisory committee's notes (1966 amendments)). The predominance inquiry is a more stringent version of the commonality

analysis; common questions must drive the litigation. *See Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008) ("[T]he commonality requirement 'is subsumed by the predominance requirement.'" (quoting *Georgine*, 83 F.3d at 627)); *Warfarin*, 391 F.3d at 528 (noting the predominance requirement to be "far more demanding" than the commonality requirement).

"[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan*, 667 F.3d at 298. Although it is sometimes necessary to determine whether the elements of each claim can be proved through evidence common to the class, *Sullivan*, 667 F.3d at 306, a settlement "obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws," *Sullivan* 667 F.3d at 304. "[W]hen dealing with variations in state laws, the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class." *Warfarin*, 391 F.3d at 529 (citing *Amchem*, 521 U.S. at 620). Additionally, because certification of a settlement class is sought, a court is "not as concerned with formulat[ing] some prediction as to how [an] element of a Sherman Act violation would play out at trial, for the proposal is that there be no trial." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 269 (3d Cir. 2009) (citations and internal quotation marks omitted).

Here, the allegation is that Comcast engaged in a common course of conduct—it unlawfully tied the sale of its Premium Cable to the rental of a Comcast Set-Top Box—and putative Class Members suffered the same injury—the payment of supracompetitive prices for their Set-Top Boxes. Accordingly, Plaintiffs satisfy the predominance requirement.

### b. Superiority

Rule 23(b)(3) requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The superiority requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those alternative available methods of adjudication.'" *Warfarin*, 391 F.3d at 533-34 (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998)). In determining whether a settlement class action is superior, a court "consider[s] the class members' interests in individually controlling litigation, the extent and nature of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties in managing a class action." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 434–35 (3d Cir. 2016), *as amended* (May 2, 2016) (citing Fed. R. Civ. P. 23(b)(3)(A)-(D)).

The parties indicate that there are approximately 3.5 million putative Class Members with low-dollar-value claims. Although there are numerous putative Class Members, there are a very small number of individual lawsuits pending against Comcast. "[I]ndividual consumer class members have little interest in 'individually controlling the prosecution or defense of separate actions' because each consumer has a very small claim in relation to the cost of prosecuting a lawsuit." *Warfarin*, 391 F.3d at 534 (quoting Fed. R. Civ. P. 23(b)(3)(A)). These costs are especially burdensome in an antitrust lawsuit. *See, e.g.,* Pl.'s Resp. Mot. Compel, ECF No. 128; Pl.'s Sur-reply Mot. Compel, ECF No. 133. The small number of lawsuits also indicates a lack of interest in individually bringing claims. *See Warfarin*, 391 F.3d at 534. "[F]rom the consumers' standpoint, a class action facilitates spreading of the litigation costs among the numerous injured parties and encourages private enforcement of the statutes." *Id.* Moreover,

settlement on a classwide basis is superior to individual adjudication because it provides putative Class Members with prompter compensation. Accordingly, Plaintiffs satisfy the superiority requirement.

In conclusion, I will certify the Settlement Class because the Settlement Class satisfies the requirements of Rule 23(a) and 23(b)(3).

## B. Final Approval of the Settlement

Plaintiffs move for final approval of the Settlement Agreement. Under Federal Rule of Civil Procedure 23(e)(2), a court may approve the settlement of a class action "only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Third Circuit has "identified two opposing interests a district court must weigh when reviewing motions for settlement-only class certification and approval of the settlement." *In re: Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 326 (3d Cir. 2019). One competing interest is to "favor the parties reaching an amicable agreement and avoiding protracted litigation." *Id.* This is because these complex actions "consume substantial judicial resources and present unusually large risks for the litigants." *GM Trucks*, 55 F.3d at 805. Therefore, when evaluating a settlement, a court should be "hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013) (citing *Warfarin*, 391 F.3d at 535).

"Settlements are private contracts reflecting negotiated compromises. The role of a district court is not to determine whether the settlement is the fairest possible resolution—a task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated imperfectly." *Id.* at 173-74 (citation omitted). A court must recognize that a settlement is a "yielding of the highest hopes in exchange for certainty and

resolution" and "guard against demanding too large a settlement based on its view of the merits." *GM Trucks*, 55 F.3d at 806.

Because courts generally favor settlement, "[a] district court . . . is to presume a settlement is fair if '(1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *Google*, 934 F.3d at 326 (quoting *NFL Concussion Litig.*, 821 F.3d at 436).

"At the same time, a district court has an obligation as a fiduciary for absent class members to examine the proposed settlement with care." *Id.* This role requires special rigor "where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously." *Warfarin*, 391 F.3d at 534; *see Google*, 934 F.3d at 326. "[A] district court's scrupulous review of the settlement terms is designed to ensure that class counsel has demonstrated sustained advocacy throughout the course of the proceedings and has protected the interests of all class members." *Google*, 934 F.3d at 326 (internal quotation marks omitted).

With these competing interests in mind, it is important to determine whether a presumption of fairness applies to the Settlement Agreement, but even more crucial to scrupulously review whether the Settlement is fair, reasonable, and adequate.

### 1. Presumption of Fairness

The Third Circuit applies "an initial presumption of fairness . . . where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of

the class objected.'" *Warfarin*, 391 F.3d at 535 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)).

In this case, Class Counsel engaged in multiple formal and informal settlement negotiations that occurred at arm's length. The parties participated in five formal mediation sessions before Thomas Rutter, Esquire, of ADR Options in Philadelphia. Thereafter, the parties participated in numerous additional robust settlement negotiations, and only reached this Fourth Amended Class Action Settlement Agreement after several failed attempts at settlement.

Class Counsel also engaged in sufficient discovery both in the form of formal discovery related to Comcast's motions to compel arbitration and informal discovery related to Set-Top Box technology and the antitrust tying allegations involved in the case.[9] The proposed Settlement was reached after repeated briefing on the threshold issue of whether Plaintiffs were compelled to individually arbitrate their claims—two full rounds of briefs prior to the Supreme Court's decisions in *Concepcion* and *Italian Colors* and an additional round of briefs after these decisions.

By the time the parties reached this Settlement Agreement, Class Counsel had a strong grasp of the legal hurdles that Plaintiffs would face in order to succeed on their claims. Class Counsel understood that many of Plaintiffs' claims could have been dismissed at an early stage of the litigation if Comcast had prevailed on the arbitration issue. In addition, Class Counsel recognized the risk that the Court would decline to certify the case or only certify regional subclasses. Moreover, Class Counsel understood that Plaintiffs would face significant obstacles in proving their case-in-chief. Class Counsel's risk assessment was further bolstered by

---

[9] Although the parties only engaged in limited formal discovery, the presumption of fairness may apply without any formal discovery. *NFL Concussion Litig.*, 821 F.3d at 436-37. "In some cases, informal discovery will be enough for class counsel to assess the value of the class' claims and negotiate a settlement that provides fair compensation." *Id.*

confirmatory discovery that occurred after the Settlement Agreement had been reached but prior to Plaintiffs' decision to move for final approval of the Settlement.

Additionally, Class Counsel is experienced in similar litigation and possess extensive knowledge of antitrust law, complex litigation and class action practice, and have substantial experience handling class actions and multidistrict litigations.

Finally, it is important to recognize that only a very small fraction of the Class has objected to the Settlement. Out of 3.5 million potential Class Members, only four individuals have objected to the Settlement.

Therefore, the presumption of fairness applies.

## 2. Factors to Consider in Evaluating the Settlement

For a class action settlement, "[d]istrict courts are to assess the fairness, reasonableness, and adequacy . . . under Rule 23(e)(2) . . . applying the *Girsh* factors; applying the *Prudential* factors where applicable; and also considering 'the degree of direct benefit provided to the class.'" *Google*, 934 F.3d at 329 (quoting *Baby Prods.*, 708 F.3d at 174).[10] Here, the *Girsh*

---

[10] Effective December 1, 2018, Rule 23(e)(2) was amended to include the following considerations to guide a court's determination of the fairness, reasonableness, and adequacy of a settlement, whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The Advisory Committee Notes recognize that prior to the addition in Rule 23(e)(2) of these explicit factors to consider, circuit courts had developed their own lists of factors to determine whether a settlement was fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2) advisory committee's notes (2018 amendments). Moreover, the Advisory Committee Notes explain: "The goal of this amendment is not to displace any factor, but rather to focus the

factors, relevant *Prudential* considerations, and *Baby Products* analysis overall weigh in favor of approval of the Settlement.

### a. The *Girsh* Factors

In *Girsh v. Jepson,* The Third Circuit directed district courts to consider the following nine factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotation marks and ellipses omitted).

### i. The Complexity, Expense, and Likely Duration of the Litigation

This factor "captures the probable costs, in both time and money, of continued litigation." *Warfarin*, 391 F.3d at 535-36 (quoting *Cendant*, 264 F.3d at 233). Antitrust class actions are particularly complex to litigate and therefore quite expensive. *See In re Auto. Refinishing Paint Antitrust Litig*., MDL No. 1426, 2008 WL 63269, at *5 (E.D. Pa. Jan. 3, 2008) ("This litigation, *like most antitrust cases*, has been exceedingly complex, expensive, and lengthy." (emphasis

---

court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Id.* Notwithstanding the amendment of Rule 23(e)(2), the Third Circuit continues to advise district courts to assess the fairness, reasonableness, and adequacy of a settlement applying the *Girsh* factors, the relevant *Prudential* considerations, and the *Baby Products* direct benefit consideration. *See Google*, 934 F.3d at 329. Following this guidance from the Third Circuit, this Court will apply the *Girsh* factors, the relevant *Prudential* considerations, and the *Baby Products* direct benefit consideration to determine whether to approve the Settlement, with the understanding that these factors and considerations amply address "the core concerns and procedure and substance" listed in the amended Rule 23(e)(2). Fed. R. Civ. P. 23(e)(2) advisory committee's notes (2018 amendments).

added)). "An antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (internal quotation marks omitted).

If litigation continued in this antitrust class action, the parties would have to engage in protracted discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a lengthy and complicated trial involving several experts with substantial expert fees. The complexity, expense, and likely duration of this antitrust class action weigh heavily in favor of approving the Settlement.

### ii. The Reaction of the Class to the Settlement

"The second *Girsh* factor 'attempts to gauge whether members of the class support the settlement.'" *Warfarin*, 391 F.3d at 536 (quoting *Prudential*, 148 F.3d at 318). Potential Class Members who are Current Subscribers received notice of the Settlement in their monthly bill. In addition, many more potential Class Members received notice via publication in various nationwide publications. The notice that potential Class Members received directed them to an Internet Settlement website that provided more detailed information about the Settlement, including a copy of the Settlement Agreement. Out of an estimated 3.5 million potential Class Members, fifty-nine individuals opted out of the proposed Settlement, and only four individuals objected to the Settlement. Thus, the overwhelming majority of potential Class Members neither opted out nor objected. Moreover, the objections provide no legitimate reason to disturb the Settlement.

Two objectors, Katherine Michelle Budney and Jean Saben, object based on a basic misunderstanding of the claims process. *See* Objections, ECF Nos. 279, 284. Budney and Saben both contend that the claims process is too onerous because they must mail documentation for

each month they rented a Set-Top Box during the Class Period in order to file a claim. The claim

form, however, does not require Current Subscribers to submit any proof of membership in the

Class, and Former Subscribers are only required to submit either a single cancelled check, credit

card, or bank statement reflecting payment to Comcast at any time during the Class Period or a

single invoice from Comcast reflecting a rental fee charge for a Set-Top Box at any time during

the Class Period. Thus, Former Subscribers must submit a single item to document membership

in the Class, and this single proof of payment may be submitted electronically via the Settlement

website along with the claim form.

The other two objectors, Edward and Darlene Orr, object on two grounds. First, the Orrs

claim that the Settlement does not properly take into consideration the needs of handicapped

Class Members who should be included in the Settlement as a separate subclass. *See* Objection

of Edward and Darlene Orr, ECF Nos. 280, 281. The Settlement, however, solely addresses

whether Premium Cable customers had to rent a cable television Set-Top Box from Comcast in

order to access Premium Cable. Both handicapped and non-handicapped Class Members were

impacted in the same manner by having to rent a Set-Top Box. Moreover, both handicapped

Class Members and non-handicapped Class Members can equally avail themselves of the cash or

in-kind relief provided by the Settlement. Therefore, there is no reason to provide any special

provisions in the Settlement to address the needs of handicapped individuals.

The Orrs also object to the Settlement's definition of Class Members who opted out of

arbitration as those who "elected to opt out of Comcast's arbitration clause as reflected in

Comcast's records." Agreement § 3.1. The Orrs cite to earlier representations made by Comcast

during this litigation that Comcast did not keep records of its Former Subscribers. They argue

that the Class definition is flawed because Comcast has not maintained a record of all individuals

who opted out of the arbitration clause during the Class Period. Additionally, they argue that the claim form is flawed because it does not provide Class Members who opted out of the arbitration clause the opportunity to submit proof that they opted out of arbitration. Comcast, however, has maintained a record of every individual who opted out the arbitration clause during the entire Class Period. Claudia Salcedo Decl., ECF No. 285-2. Therefore, this objection is without merit.

Only a minimal number of individuals opted out of, or objected to, the Settlement and those who did object presented meritless objections. The extremely low percentage of objectors and opt-outs is well within the percentage of opt-outs and objectors that this Circuit has previously held favors approval of a settlement under this factor. *See, e.g.*, *Prudential*, 148 F.3d at 318 (affirming the district court's conclusion that the reaction of the class was favorable when 19,000 out of 8 million of the class members opted out and 300 objected); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1314 (3d Cir. 1993) (concluding that the "small proportion of objectors does not favor derailing settlement"). Thus, the reaction of the Class weighs in favor of approving the Settlement.

### iii. The Stage of the Proceedings and the Amount of Discovery Completed

"The third *Girsh* factor captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *NFL Concussion Litig.*, 821 F.3d at 438-39 (quoting *Warfarin*, 391 F.3d at 537). "[F]ormal discovery is not a requirement for the third Girsh factor. What matters is not the amount or type of discovery class counsel pursued, but whether they had developed enough information about the case to appreciate sufficiently the value of the claims." *Id.* at 439.

Here, Class Counsel engaged in sufficient informal and formal discovery, related to Comcast's motions to compel arbitration and to Set-Top Box technology and the antitrust tying allegations involved in the case, to adequately appreciate the merits of the case before negotiating. The proposed Settlement was reached after repeated briefing on the threshold issue of whether Plaintiffs were compelled to individually arbitrate their claims—two full rounds of briefs prior to the Supreme Court's decisions in *Concepcion* and *Italian Colors* and an additional round of briefs after these decisions. Moreover, by the time the parties reached the Settlement Agreement, Class Counsel had a strong grasp of the legal hurdles that Plaintiffs would face in order to succeed on their claims, including the risks that the Court would compel arbitration or decline to certify the case or only certify regional subclasses. Therefore, this factor weighs in favor of approving the Settlement.

### iv. The Risks of Establishing Liability and Damages

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Id.* (quoting *Prudential*, 148 F.3d at 319).

In this case, Plaintiffs faced significant risks in litigating this action. Foremost, during the pendency of this action, the legal landscape on arbitration changed drastically with the Supreme Court's decisions in *Concepcion* and *Italian Colors*, and exponentially increased the risk that the majority of Class Members would have to face individual arbitration, a task that no attorney could afford to pursue based on the costs associated with proving antitrust claims.

Additionally, because Comcast has 110 distinct service areas, Plaintiffs faced the significant possibility that the Class would not be certified or that regional subclasses would need to be established, each of which would have required its own economic analysis that would have

greatly increased the cost and complexity of litigation.  For instance, in *In re Cox Enterprises, Inc. Set-Top Box Antitrust Litig.*, No. 09-ML-2048-C, 2011 WL 6826813, at *16 (W.D. Okla. Dec. 28, 2011), a similar antitrust tying case against a different cable television provider, the district declined to certify a national class, holding that market power and antitrust injury could not be proven on a national level and would require multiple regional analyses.

Moreover, Comcast had asserted several defenses to this action; thus, Plaintiffs faced a risk of dismissal or ultimate loss.  For instance, there have been several lawsuits by cable television customers claiming that their cable television providers unlawfully tied the provision of cable services to the rental of set-top boxes.  In a few of these lawsuits, circuit courts have rejected the claims.  *See In re: Cox Enterprises, Inc*., 871 F.3d 1093 (10th Cir. 2017); *Kaufman v. Time Warner*, 836 F.3d 137 (2d Cir. 2016).  Although Plaintiffs contended that Comcast had an illegal tying arrangement in which Premium Cable customers were required to rent a Set-Top Box, Plaintiffs faced challenges to proving that there was any alternative to their rental of the Set-Top Boxes, which Comcast foreclosed as a result of its conduct. This is because informal and confirmatory discovery revealed that no true market existed for the sale and/or purchase of set-top boxes from Comcast or anyone else.  Additionally, when others attempted to manufacture and sell set-top boxes, there was little consumer demand and the sales were minimal.

Accordingly, the Settlement avoids the many significant hurdles that Plaintiffs would have encountered in establishing liability and damages.  Therefore, the fourth and fifth *Girsh* factors weigh in favor of approving the Settlement.

### v. The Risks of Maintaining the Class Action Through the Trial

This factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *Warfarin*, 391 F.3d at 537.  Because class certification is subject

to review and modification at any time during the litigation, *see, e.g., Zenith Labs., Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976), the uncertainty of maintaining class certification favors settlement. "In a settlement class, this factor becomes essentially toothless because a district court need not inquire whether the case, if tried, would present intractable management problems[,] . . . for the proposal is that there be no trial." *NFL Concussion Litig.*, 821 F.3d at 440 (internal quotation marks omitted). Thus, this factor "deserve[s] only minimal consideration." *Id.*

Here, Plaintiffs faced real risks to obtaining and keeping class certification if the action were to proceed to trial. For instance, if the parties had not settled, Comcast may have contested certification on the basis that former customers were not ascertainable.[11] Additionally, Comcast may have argued that the many differences between its 110 services areas created insurmountable individual issues that prevented obtaining or keeping certification. Therefore, this factor weighs in favor of approving the Settlement.

### vi. The Ability of Defendants to Withstand a Greater Judgment

"The seventh *Girsh* factor considers 'whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement.'" *Warfarin*, 391 F.3d at 537-38 (quoting *Cendant*, 264 F.3d at 240). "The seventh *Girsh* factor is most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement." *NFL Concussion Litig.*, 821 F.3d at 440; *see also Warfarin*, 391 F.3d at 538 (finding no error with the

---

[11] Ascertainability is typically a "necessary prerequisite" of a Rule 23(b)(3) class. *Byrd*, 784 F.3d at 162. "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.* at 163 (internal quotation marks omitted). Because Comcast lacks records for most Former Subscribers, Comcast may have contested, if this case proceeded toward trial, whether a reliable and administratively feasible method exists to determine if its Former Subscribers fall within the class definition.

district court's conclusion that "DuPont's ability to pay a higher amount was irrelevant to determining the fairness of the settlement"). "[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the . . . settlement." *NFL Concussion Litig.*, 821 F.3d at 440 (internal quotation marks omitted).

Plaintiffs concede that Comcast likely could have withstood a greater judgment, which makes sense given that Comcast is a large corporation. This factor, however, does not undermine the reasonableness of the Settlement because during settlement negotiations Comcast never professed an inability to pay Plaintiffs.

### vii. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of all the Attendant Risks of Litigation

"In evaluating the eighth and ninth *Girsh* factors, we ask 'whether the settlement represents a good value for a weak case or a poor value for a strong case.'" *Id.* (quoting *Warfarin*, 391 F.3d at 538). "The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Warfarin*, 391 F.3d at 538. "[T]he present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *NFL Concussion Litig.*, 821 F.3d at 440 (quoting *Prudential*, 148 F.3d at 322).

If Plaintiffs were to succeed at trial on their federal antitrust and state law claims, they would likely recover millions of dollars in damages. Plaintiffs, however, face the uniquely heightened risk of never making it to trial because of the Supreme Court's jurisprudence in *Concepcion* and *Italian Colors*, which likely would require Plaintiffs to individually arbitrate most of their claims, and would probably result in negligible recovery. Here, Plaintiffs

negotiated a Settlement with a potential value of $15.5 million.  In light of the current legal

landscape on arbitration, this amount represents a good value for a weak case.  Therefore, these

factors weigh in favor of approving the Settlement.

### b. The *Prudential* Considerations

In *In re Prudential Insurance Co. America Sales Practice Litigation*, the Third Circuit

expanded the analysis of factors to consider in evaluating a settlement to include what are now

referred to as *Prudential* considerations:

> the maturity of the underlying substantive issues, as measured by experience in
> adjudicating individual actions, the development of scientific knowledge, the extent
> of discovery on the merits, and other facts that bear on the ability to assess the
> probable outcome of a trial on the merits of liability and individual damages; the
> existence and probable outcome of claims by other classes and subclasses; the
> comparison between the results achieved by the settlement for individual class or
> subclass members and the results achieved—or likely to be achieved—for other
> claimants; whether class or subclass members are accorded the right to opt out of
> the settlement; whether any provisions for attorneys' fees are reasonable; and
> whether the procedure for processing individual claims under the settlement is fair
> and reasonable.

*Prudential*, 148 F.3d at 323.  "Unlike the *Girsh* factors, each of which the district court must

consider before approving a class settlement, the *Prudential* considerations are just that,

prudential. They are permissive and non-exhaustive . . . ."  *Baby Prods.*, 708 F.3d at 174.

Here, Class Counsel were able to make an informed decision about the probable

outcome of a trial.  All Class Members had the opportunity to opt out of the Settlement.  The

procedure for processing individual claims under the settlement is fair and reasonable.  Only

Former Subscribers must submit proof of payment to Comcast with their claim form and the

proof is not onerous.  The only form of proof that Former Subscribers must submit is either a

single cancelled check, credit card, or bank statement reflecting payment to Comcast during the

Class Period or a single invoice from Comcast reflecting a rental fee charge for a Set-Top Box

during the Class Period.  Additionally, as discussed later in this memorandum, the provisions for attorneys' fees are reasonable.  Therefore, the relevant *Prudential* considerations weigh in favor of approving the Settlement.

### c. The Degree of Direct Benefit Provided to the Class

In *In re Baby Products Antitrust Litigation*, the Third Circuit articulated an additional consideration for evaluating a settlement—"the degree of direct benefit provided to the class." *Baby Prods.*, 708 F.3d at 174.  The Third Circuit explained:

> In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards.

*Id.*

Here, the Settlement Agreement created a substantial common fund with a potential $15.5 million value that was intended to compensate an estimated 3.5 million Class Members.  In order to inform potential Class Members about the Settlement, Class Counsel engaged in a thorough notice process.  Current Subscribers received notice of the Settlement in their monthly bill.  In addition, many more potential Class Members received notice via publication in various nationwide publications. The notice that potential Class Members received directed them to an Internet Settlement website that provided more detailed information about the Settlement, including a copy of the Settlement Agreement.  The claim form that Class Members had to submit in order to obtain compensation from the Settlement was easy to fill out and enabled Class Members to submit their claims either electronically or through the mail.  Despite efforts to notify potential Class Members, only 20,262 individuals filed claims for a total of $211,255.00 in cash payments plus an additional $286,986.50 in in-kind relief.  Joint Notice, ECF No. 287.

While the number of Class Members who will receive compensation is low, this consideration should not detract from the many factors that weigh in favor of approving the Settlement. Ideally, many more Class Members would have submitted claims. It is likely, however, that if no Settlement Agreement had been reached, even fewer potential Class Members would have received any benefit from this litigation due to several significant hurdles in this case. Despite a weak case, Class Counsel continued to prioritize obtaining a direct benefit for potential Class Members and ultimately achieved a Settlement with the potential to directly benefit an estimated 3.5 million consumers.

Because the *Girsh* factors and *Prudential* considerations overwhelming weigh in favor of approving the Settlement, and the degree of direct benefit to the Class does not counsel against approving the Settlement, I will grant final approval of the Settlement.

### C. Attorneys' Fees and Reimbursement of Litigation Expenses

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). The Settlement Agreement provides that "Comcast shall not oppose the Court's approval of attorneys' fees and costs up to the sum of one million, one hundred thousand U.S. dollars and no cents ($1,100,000.00)."[12] Agreement § 9.5. Accordingly, Plaintiffs request $1,100,000 as an

_____

[12] An agreement by the defendant not to object to a plaintiff's fee request if it is under a certain dollar amount "is often referred to as a 'clear sailing provision' (probably because the implication is that the fee request stands a much better chance of court approval if the defendant is not objecting)." *NFL Concussion Litig.*, 821 F.3d at 447. The Third Circuit has "declin[ed] to hold that clear sailing provisions are *per se* bars to settlement approval while nonetheless emphasizing that they deserve careful scrutiny in any class action settlement." *Id.* In a settlement involving a clear sailing provision, the Third Circuit has instructed a district court to "review the process and substance of the settlement and satisfy itself that the agreement does not indicate collusion or otherwise pose a problem." *Id.* Here, the Settlement Agreement was negotiated at arm's length and there is no indication of collusion or any other problem.

award of attorneys' fees and reimbursement of expenses.[13]  Nonetheless, "[a] thorough judicial review of fee applications is required in all class action settlements."  *Prudential*, 148 F.3d at 333 (quoting *In re G.M.*, 55 F.3d at 819); *see also Baby Prods.*, 708 F.3d at 178-80.

Courts generally use one of two methods for assessing attorneys' fee requests: the lodestar method or the percentage-of-recovery method.  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005), *as amended* (Feb. 25, 2005).  The lodestar method is more commonly the starting point in statutory fee-shifting cases.  *Id.*  The percentage-of-recovery method, on the other hand, is "generally favored in common fund cases."  *Id.*  This case involves a common fund, and therefore the percentage-of-recovery method is appropriate.  Although not "necessarily determinative," the use of the lodestar method of fee approval also provides a cross-check of a court's initial fee calculation under the percentage-of-recovery method.  *Baby Prods.*, 708 F.3d at 179-80; *see also In re Rite Aid*, 396 F.3d at 300.

Because the percentage-of-recovery method and the lodestar cross-check demonstrate that the attorneys' fee request is reasonable, I will approve Plaintiffs' request for $1,100,000 as an award of attorneys' fees and reimbursement of expenses.

## 1. Percentage-of-Recovery Method

In deciding what amount is a reasonable fee award under the percentage-of-recovery method, a district court must consider the following ten factors known as the *Gunter/Prudential* factors:

---

[13] Class Counsel seeks $91,604.42 for reimbursement of expenses.  Thus, Class Counsel seeks $1,008,395.58 in attorneys' fees.  "Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action."  *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 108 (D.N.J. 2001); *see also Mayer v. Driver Sols., Inc.*, No. 10-1939, 2012 WL 3578856, at *5 (E.D. Pa. Aug. 17, 2012).  Because reimbursement of $91,604.42 in litigation expenses is reasonable, the focus will be on Plaintiffs' request for attorneys' fees.

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009) (citations omitted).

Importantly, however, before reaching any single *Gunter/Prudential* factor, a court "should begin by determining with reasonable accuracy the distribution of funds that will result from the claims process." *Baby Prods.*, 708 F.3d at 179. "Th[e] court should then, relying on the *Gunter/Prudential* factors and its experience, determine whether the level of distribution provided to the class by the settlement reflects a failure of class counsel to represent adequately the interests of the entire class." *Id.*

Plaintiffs estimate that the Class consists of approximately 3.5 million consumers. The Settlement Agreement provided that Comcast would pay all claims made in the aggregate that do not exceed $15.5 million in value. If Class Members submitted less than $15.5 million worth of claims, however, then Comcast would retain the balance. Class Members had to submit a Claim Form to the Claims Administrator that was postmarked, or submitted on the Settlement website, no later than ten days prior to the Final Fairness Hearing—August 31, 2019. The time period for submitting claims has now ended. Despite the Settlement's potential $15.5 million value, it is now known that only 20,262 individuals filed claims for a total of $211,255.00 in cash payments plus an additional $286,986.50 in in-kind relief. Joint Notice, ECF No. 287.

Although this is a very low claims rate, an examination of the *Gunter/Prudential* factors demonstrates that that the low level of distribution of benefits to the Class does not reflect a failure of Class Counsel to adequately represent the interests of the Class.

### a. The Size of the Fund Created and the Number of Beneficiaries

Plaintiffs negotiated a Settlement that created a fund with a sizable value—worth up to $15.5 million—that had the potential to benefit an estimated 3.5 million Class Members. In calculating a percentage fee award in a class action involving a settlement fund, the Supreme Court has recognized "that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole," even if part of the fund reverts to the defendant. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). This is because even if class members have not filed claims to receive compensation from the fund, "[t]heir right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel." *Id.* at 480. When attorneys' fees are calculated based on the entire fund, a court "requir[es] every member of the class to share attorney's fees to the same extent that he can share the recovery." *Id.* Therefore, it is only appropriate to decrease the fee award "[w]here a district court has reason to believe that counsel has not met its responsibility to seek an award that adequately prioritizes direct benefit to the class." *Baby Prods.*, 708 F.3d at 178.

In deciding whether to reduce a fee award based on class counsel's failure to adequately prioritize direct benefit to the class, the Third Circuit has cautioned:

> There are a variety of reasons that settlement funds may remain even after an exhaustive claims process—including if the class members' individual damages are simply too small to motivate them to submit claims. Class counsel should not be penalized for these or other legitimate reasons unrelated to the quality of

representation they provided. Nor do we want to discourage counsel from filing class actions in cases where few claims are likely to be made but the deterrent effect of the class action is equally valuable.

*Id.*

Here, Plaintiffs engaged in a thorough claims process. Current Subscribers received notice of the Settlement in their monthly bill. In addition, many more potential Class Members received notice via publication in various nationwide publications. The notice that potential Class Members received directed them to an Internet Settlement website that provided more detailed information about the Settlement, including a copy of the Settlement Agreement. The claim form that Class Members had to submit in order to obtain compensation from the Settlement was easy to fill out and submit. The claim form did not require Current Subscribers to submit any proof of membership in the Class, and Former Subscribers were only required to submit either a single cancelled check, credit card, or bank statement reflecting payment to Comcast at any time during the Class Period or a single invoice from Comcast reflecting a rental fee charge for a Set-Top Box at any time during the Class Period. Moreover, Class Members could submit their claims electronically or through the mail.

In this case, it appears that the compensation for individual damages was simply too small to motivate many Class Members to file a claim. Class Counsel admirably continued to pursue Plaintiffs' case even after a huge shift in the legal landscape of arbitration that occurred with the Supreme Court's decisions in *Concepcion* and *Italian Colors*, which rendered it likely that most claims would have to be individually arbitrated and would likely result in negligible recovery. Despite a weak case, Class Counsel continued to prioritize obtaining a direct benefit for potential Class Members. Class Counsel persevered and were able to obtain a settlement that provided benefits to many individuals who would most likely have received no benefit without

the Settlement Agreement. Because Class Counsel adequately prioritized the direct benefit to the Class, attorneys' fees should be calculated based on the entire fund. Given the significant size of the common fund—$15.5 million dollars—and the potential for 3.5 million Class Members to receive benefits, many of whom would likely have received nothing without this Settlement, this factor weighs in favor of approving Plaintiffs' fee request.

### b. The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel

Out of an estimated 3.5 million Class Members, only four individuals objected to the Settlement. None of the objections provided a legitimate reason to disturb the Settlement. Moreover, no one objected to Class Counsel's proposal to seek an award of attorneys' fees and expenses up to $1,100,000. Because there have been no objections pertaining to attorneys' fees, this factor weighs in favor of approving Plaintiffs' fee request.

### c. The Skill and Efficiency of the Attorneys Involved

As previously discussed, Ms. Nast, Mr. Wexler, and Mr. Corr. have extensive knowledge of antitrust law, complex litigation and class action practice, and have substantial experience handling class actions and multidistrict litigations. Throughout the course of this litigation, Ms. Nast, Mr. Wexler, and Mr. Corr have identified and investigated potential claims in the action. In addition, in recognition of two important Supreme Court opinions on arbitration, *Concepcion* and *Italian Colors*, they have on several occasions re-examined the strength of their legal claims and had to adapt their legal strategies. The ability of Class Counsel to obtain a favorable Settlement "in the face of formidable legal opposition further evidences the quality of their work." *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 496 (E.D. Pa. 2003). This factor weighs in favor of approving Plaintiffs' fee request.

### d. The Complexity and Duration of the Litigation

The factors which increase the complexity of a class action include: "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 741 (3d Cir. 2001). Antitrust class actions are particularly complex to litigate and therefore quite expensive. *See In re Auto. Refinishing*, 2008 WL 63269, at *5 ("This litigation, *like most antitrust cases*, has been exceedingly complex, expensive, and lengthy." (emphasis added)). "An antitrust class action is arguably the most complex action to prosecute." *In re Linerboard.*, 296 F. Supp. 2d at 577 (internal quotation marks omitted).

This case involved complex antitrust litigation and novel issues about arbitration that required thousands of hours of work. Unfortunately for Plaintiffs, the novel arbitration issues were ultimately resolved by the Supreme Court in *Concepcion* and *Italian Colors* in a way that profoundly disadvantaged Plaintiffs, which forced Plaintiffs to reassess their case and negotiation strategies. This factor weighs in favor of approving Plaintiffs' fee request.

### e. The Risk of Nonpayment

In every class action in which class counsel bring a case on a contingency basis, there is some risk of nonpayment. In this case, prior to the Settlement Agreement, the risk of nonpayment increased exponentially after the Supreme Court issued its decisions in *Concepcion* and *Italian Colors* when the chance of Plaintiffs' success decreased substantially. The risk of nonpayment at this point, however, is minimal given Comcast's apparent financial health and commitment not to oppose this fee request. The Third Circuit has "never addressed whether courts must reconsider the risk of nonpayment as the action evolves." *In re Diet Drugs*, 582 F.3d at 543. The best practice, however, is to examine the risk of nonpayment throughout the

litigation.  *See Sullivan*, 667 F.3d at 332 (assessing "risk of nonpayment throughout the litigation").

Because the risk of nonpayment changed throughout the course of this litigation, this factor weighs only mildly in favor of approving Plaintiffs' fee request.

### f. The Amount of Time Devoted to the Case by Plaintiffs' Counsel

Through May 9, 2019, Plaintiffs' counsel devoted 11,280.65 hours to this action.  Dianne M. Nast Decl. ¶ 41, ECF No. 278-2.  The time spent by Plaintiffs' counsel was necessary for the successful settlement of this case considering both the complexity involved and the defenses mounted by the Comcast.  This factor weighs in favor of approving Plaintiffs' fee request.

### g. The Awards in Similar Cases

Counsel request a fee that is 6.6% of the entire common fund. In this District, "fee awards generally range between nineteen and forty-five percent of the common fund." *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 653 (E.D. Pa. 2015) (collecting cases). Moreover, "courts within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses." *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005) (collecting cases).  Plaintiffs' fee request is based on a substantially smaller percentage of the common fund than is typically requested in similar cases. This factor weighs in favor of approving Plaintiffs' fee request.

### h. The Value of Benefits Attributable to the Efforts of Class Counsel Relative to the Efforts of Other Groups, Such as Government Agencies Conducting Investigations

This factor contemplates whether Class Members benefitted from "the efforts of other groups, such as government agencies conducting investigations."  *In re AT & T Corp.*, 455 F.3d 160, 165 (3d Cir. 2006).  Here, Plaintiffs' counsel developed this case without the assistance of

government agencies or other groups.  This factor weighs in favor of approving Plaintiffs' fee request.

> **i. The Percentage Fee that Would have been Negotiated had the Case been Subject to a Private Contingent Fee Arrangement at the Time Counsel was Retained**

Plaintiffs' percentage fee request of 6.6% of the common fund is a far lower percentage than is typically negotiated in private contingency fee cases.  *See In re Aetna Inc.*, MDL No. 1219, 2001 WL 20928, at *14 (E.D. Pa. Jan. 4, 2001) ("[A]n award of thirty percent is in line with what is routinely privately negotiated in contingency fee tort litigation.); *In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[I]n private contingency fee cases . . . plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery.").  This factor weighs in favor of approving Plaintiffs' fee request.

> **j. Any Innovative Terms of Settlement**

In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request.

Overall, the *Gunter/Prudential* factors demonstrate that Plaintiffs' request for $1,100,000 as an award of attorneys' fees and reimbursement of expenses is reasonable.

### 2. Lodestar Method

After a district court applies the percentage-of-recovery method to determine whether a fee request is reasonable, it is sensible to also apply "an abridged lodestar analysis serving as a cross-check."  *In re Rite Aid*, 396 F.3d at 305.  "But the lodestar cross-check does not trump the primary reliance on the percentage of common fund method." *Id.* at 307.  "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.  The district

courts may rely on summaries submitted by the attorneys and need not review actual billing records." *Id.* at 306-07 (footnote omitted).

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Id.* at 305. "The crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *In re AT & T*, 455 F.3d at 164. A negative lodestar multiplier "suggests that class counsel would not be overpaid for their services if compensated as requested, but it also suggests that counsel has a significant financial incentive to cut its losses and settle the lawsuits." *Baby Prods.*, 708 F.3d at 180 n.14.

Plaintiffs' counsel devoted over 11,280.65 hours to this action, resulting in a lodestar award of $5,636,916.25. When Plaintiffs' fee request of $1,100,000 is divided by the lodestar award of $5,636,916.25, it results in a significant negative multiplier of .195. The negative multiplier suggests that Plaintiffs' fee request is reasonable.[14]

Because both the percentage-of-recovery method and the lodestar cross-check indicate that Plaintiffs' fee request is reasonable, I will approve Plaintiffs' request for $1,100,000 as an award of attorneys' fees and reimbursement of expenses.

### D. Incentive Awards for Class Representatives

Plaintiffs' request an incentive award of $1,000 for each of the named class representatives (an aggregate of $4,000) for their contributions to the case. "Incentive awards, also known as 'enhancement awards' or 'service payments,' are common in class actions that

---

[14] Admittedly, Class Counsel had "a significant financial incentive to cut its losses and settle the lawsuits," *Baby Prods.*, 708 F.3d at 180 n.14, but settlement also made strategic sense given several significant hurdles to successful litigation, including the substantial risk that many potential Class Members would be required to resolve their claims in individual arbitration.

result in a common fund for distribution to the class." *Altnor v. Preferred Freezer Servs., Inc.*, 197 F. Supp. 3d 746, 769 (E.D. Pa. 2016). "The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *Sullivan*, 667 F.3d at 333 n.65 (internal quotation marks omitted).

Because the named class representatives provided information necessary to Plaintiffs' counsel for filing the Complaint and for negotiating the Settlement, I will approve Plaintiffs' request for an incentive award of $1,000 to each named class representative.

## IV. CONCLUSION

For the above reasons, I will grant Plaintiffs' motion for class certification and final approval of the Settlement. I will also grant Plaintiffs' motion for attorneys' fees, reimbursement of expenses, and incentive awards to class representatives. Accordingly, I will approve Plaintiffs' request for $1,100,000 as an award of attorneys' fees and reimbursement of expenses. I will also approve Plaintiffs' request for an incentive award of $1,000 for each named class representative.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on  9/24/2019